## MILLER ET AL. *v.* SALABES

[No. 217, September Term, 1960.]

*Decided April 5, 1961.*

The cause was argued before BRUNE, C. J., and PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*George Gump,* with whom were *Joseph Bernstein, Robert F. Hochwarth* and *Frank, Bernstein, Gutberlet & Conaway* on the brief, for the appellants.

*Samuel J. Fisher* and *Allan H. Fisher, Jr.,* for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

From a decree of the Circuit Court of Baltimore City holding that the appellee, Katherine S. Salabes, is the sole proprietress of the Consolidated Loan Company (sometimes hereinafter referred to as the Company), and that the appellant, Lewis E. Hess, is not a partner in the Company, the appellant appeals.

The principal issue to be determined is single in nature and narrow of scope. It is simply whether or not Lewis E. Hess is a partner in the Company.

The applicable law is clear and well established. The existence of a partnership will not be presumed, but must be proved, 68 C.J.S., *Partnership,* § 51, with the burden of proving such existence resting upon the party having the affirmative of that issue. *McBriety v. Phillips,* 180 Md. 569, 26 A. 2d 400; *Beard v. Beard,* 185 Md. 178, 44 A. 2d 469. Between the parties, the existence of a partnership, *vel non,* is a matter of the parties' intention proved by their expressed

agreement, or inferred from their acts and conduct.[1] And this intention is to be determined as it is disclosed by all of the transactions between the parties. *Townsend v. L. J. Appel Sons, Inc.*, 164 Md. 255, 257, 164 A. 679; *Vlamis v. DeWeese*, 216 Md. 384, 140 A. 2d 665; *Smith v. Smith*, 189 Md. 1, 53 A. 2d 15. The receipt by a person of a share of the profits of a partnership business (with certain exceptions noted in Code [1957], Article 73 A, § 7 [4]) is *prima facie* evidence that he is a partner in the business. *Ibid.; Cohen v. Orlove*, 190 Md. 237, 57 A. 2d 810. The probative force of the sharing of profits is not conclusive on the question of the existence of a partnership, but may be rebutted by a showing of fact to the contrary. 68 C.J.S., *Partnership*, § 17 (c). The death of one of the partners dissolves the partnership, Code (1957), Article 73 A, § 31, but the partnership is not terminated until the winding up of the partnership affairs is completed. *Illian v. Northwestern Ins. Co.*, 215 Md. 507, 513, 138 A. 2d 884. And a conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management of the partnership business. Code (1957), Article 73 A, § 27 (1).

We turn now to an application of the facts in the instant case to the principles of law as we have stated them above, with our principal inquiry directed to a determination of the intention of the parties as disclosed by their actions, conduct and agreements.

Prior to his death in 1928, one Sody Salabes and his son, Meyer S. Salabes, had conducted a business known as "Lewyt and Salabes," or The Consolidated Loan Company. By his last will and testament, Sody bequeathed his interest in the business to his three children, Meyer S., Marie Hess, and Sarah Strouse. He directed that the business be continued,

---

1. *Morgart v. Smouse*, 103 Md. 463, 63 A. 1070; *Cohen v. Orlove*, 190 Md. 237, 57 A. 2d 810; *Collier v. Collier*, 182 Md. 82, 88, 32 A. 2d 469; *Douglass v. Safe Dep. & Tr. Co.*, 159 Md. 81, 93, 150 A. 37.

and provided that after the death of his wife, each of his daughters should receive 25% of the "net profits" therefrom, and his son, Meyer, 50%. The will further provided that Meyer should have exclusive control of the conduct of the business, but if either of the daughters desired to withdraw her "capital," she should give six months' notice before doing so.

Sometime during 1928, after the death of their father, the three children entered into a written agreement whereby they explicitly agreed to operate the business as a partnership. They agreed to conduct the same in accordance with the will of Sody Salabes, that the business was not to be sold to outsiders and that the profits would be divided into thirds. This agreement further provided:

> "7. Should any of the three parties hereto depart this life, then the personal representatives of the one so dying shall have the right to permit the capital to remain in the business of the firm at the option of the representatives of the deceased partner, receiving the profits provided for in the will of Sody Salabes. If, however, the one dying shall be Meyer S. Salabes, then the profits after his death shall be divided into three equal parts, instead of as provided in the will of said Sody Salabes, and the survivors, in the event of his death, shall have the exclusive control of said business and direct the policy and the management thereof; and in the event that the representatives of the one so dying shall desire to withdraw the capital account, then the survivors shall have a right to pay said capital account within a period of five years, * * *."

Marie Hess, one of Sody's daughters, died, testate, in 1944. In her will, she referred to the agreement with her brother and sister executed in 1928, and the provision therein giving her personal representatives the right to permit her interest in the partnership to remain in the business. She directed her executors to permit her entire interest to remain in the busi-

ness and stated that "all income, profits and dividends to which the said partnership interest may be entitled in said partnership shall be paid" unto her beneficiaries.

After the death of her husband in 1948 and in accordance with her will, Marie Hess's share of the profits of the business was divided as follows: 50% to her son, Lewis Hess, one of the appellants, for life; 25% to her daughter-in-law, Alice Hess, for life; and 25% to her grandson, Robert Hess, for life, with remainder in each case to various trust estates.

Marie Hess also directed that during the lifetime of Meyer S. Salabes; neither her executors, trustees nor legatees should have any voice in the management or administration of the partnership, or the right to interfere in the partnership business.

Meyer S. Salabes died on December 23, 1953. In his will, he bequeathed his share in the business to the appellee, Katherine S. Salabes.

Shortly after the death of Meyer, a written agreement was executed on February 16, 1954, which was superseded by another written agreement, dated April 5, 1955. More will be said concerning these agreements later.

On January 26, 1957, Lewis E. Hess assigned to Mose Miller all of his right, title and interest "in and to the partnership known as Consolidated Loan Company, and in and to the capital account of the Estate of Marie S. Hess in said partnership." It was stipulated that if Miller and Hess had testified in the case, they would have stated that this assignment was made to secure an indebtedness owed to Miller by Hess, and that all sums payable from the partnership to Hess from the date of the assignment have been paid to Miller.

On June 22, 1959, Sarah Strouse assigned and transferred her entire interest in the Company to Katherine S. Salabes. (These assignments, of themselves, did not dissolve the partnership, if there were one. Code [1957], Article 73 A, § 27 [1], *supra.*)

On March 14, 1960, Katherine S. Salabes filed her bill of complaint praying a declaratory decree that she "is now the sole remaining partner in, or the sole proprietress of, Con-

solidated Loan Company, subject to the one-third interest therein of Marie S. Hess, now held by H. Lee Allers, Jr., successor substituted trustee under the will of Marie S. Hess" and "subject to the life interests therein of Lewis E. Hess, Alice R. Hess and Robert Hess, pursuant to the provisions of said will."

The lower court held that Lewis E., Alice R., and Robert Hess were not partners in the business known as the Consolidated Loan Company, and that Katherine S. Salabes was the sole proprietress of the Company, subject to the rights of Lewis E., Alice R., and Robert Hess to receive their respective portions of the profits of the business as provided in the will of Marie Hess and in the agreement of April 6, 1955, subject further to the rights of the trustee under the will of Marie Hess upon the deaths of said Lewis E., Alice R., and Robert Hess, or upon a distribution of the capital investment of Marie Hess in said business.

In deciding the case below, the learned chancellor, apparently, considered the agreements of 1954 and 1955 of little importance in determining whether Lewis E. Hess was a partner in the Company at the time of the trial, and seems to have felt that the terms of the will of Marie Hess controlled his status in relation to the Company. We deem the agreements to have been, and to be now, of prime and poignant significance.

We shall analyze the situation of the parties just prior to the agreement of February 16, 1954; and for purposes of this decision, we shall assume that at no time up to that point had Lewis been a partner in the Company. Compare 68 C.J.S., *Partnership,* p. 803. The partnership, as it had previously existed, had been dissolved, less than two months before, by the death of Meyer S. Salabes on December 23, 1953, although it had not been terminated. Code (1957), Article 73 A, §§ 30, 31. At that time, the estate of Meyer owned a "capital account" interest in the Company of $86,-514.13; Sarah Strouse a "capital account" interest of $82,-052.18; the trust estate of Marie S. Hess a "capital account" of $73,092.67 (subject to the rights of Lewis E., Alice R.,

and Robert Hess to receive "all income, profits and dividends, in named proportions, for life"); and Lewis E., Alice R., and Robert Hess had certain "credit" interests therein, aggregating some $10,000. At this point any one of the beneficial owners could have demanded (subject to an interpretation of the will of Marie Hess, wherein she *directed* her *executors* to allow her interest to remain in the business and *permitted* her *personal representatives* to do so, and section 7 of the agreement of 1928 of the three children of Sody Salabes, quoted above—that section not being completely clear as to whether it should apply if, and when, *two* of the partners died, or only applied upon the death of any *one* of the three partners) a termination of the partnership as it had existed before, at least to the extent of his or her interest therein. Of course, if any one, or more, of the beneficial owners had the right to withdraw their interests in the Company, and did so, there was, apparently, nothing to prevent the remaining owners from forming a partnership, with a decreased capital, to carry on the business.

Faced with the above situation, all of the parties in interest entered into the agreement of February 16, 1954, "for the purpose of making plans for the continuation, sale, dissolution, or other disposition" of the Company "for the benefit of all parties hereto" agreeing not to withdraw, with one exception, any "capital account or other credit" from the Company for a period of one year, unless "said partnership shall be sooner sold, dissolved or terminated by the mutual agreement of all of the parties hereto." The agreement stated the "capital" and "credit" accounts of the parties, and went on to provide that the net profits would be shared ⅓ to the estate of Meyer S. Salabes, ⅓ to Sarah Strouse, 1/6 to Lewis E. Hess, 1/12 to Alice R. Hess and 1/12 to Robert Hess. It will be here noted that although this agreement did not explicitly spell out the fact that the parties thereto were forming a new partnership to carry on the business, it did provide that the "partnership" shall not be "sold, dissolved or terminated" except by the agreement of *all* of the parties, of whom Lewis E. Hess was one; and, the agreement re-

fers, at least nine times, to the "partnership." There is another feature of this agreement that has some minor significance. The trustees under the will of Marie Hess, obviously seeing the implications of having possibly, if not specifically, created a partnership, inserted a provision in the agreement that the trustees should be bound thereunder only to the extent of any part of the capital account of Marie Hess in the hands of the trustees from time to time.

Shortly after the expiration of the one-year period mentioned in the above agreement, the substituted trustees under the will of Marie Hess, Sarah Strouse, Katherine S. Salabes (who had received Meyer's interest as his legatee), Lewis E. Hess, Alice R. Hess, and Robert Hess, the beneficial owners of the Company, entered into a further agreement, which is still in effect and is, we think, controlling in the controversy between the parties. It was executed on April 6, 1955, and stated that the partnership trading as The Consolidated Loan Company was to continue until July 31, 1955, "unless said partnership shall be sooner sold, dissolved or terminated by the mutual agreement of all the undersigned." It further provided:

> "Anything herein to the contrary notwithstanding, said partnership shall continue for periods of six months each, accounting from August 1, 1955, unless one of the Undersigned shall notify each of the others in writing, at least sixty days prior to the termination of any such six months' period, that he or she desires that said partnership shall terminate at the end of the said six months' period."

The "capital accounts" of Sarah Strouse, Katherine S. Salabes (as the legatee of Meyer S.), and the trust estate of Marie Hess were stated to be in approximately the same amounts as those mentioned in the 1954 agreement; and the "credits" of Lewis E., Alice R., and Robert Hess were about the same, except Lewis E. Hess's credit had been decreased by some $3,500. The parties then agreed that George S. Salabes (the son of Katherine S. and the late Meyer Salabes)

should be employed by the partnership as its general manager, that the net profits should be divided ⅓ to Sarah Strouse, ⅓ to Katherine Salabes, 1/6 to Lewis E. Hess, 1/12 to Alice R. Hess and 1/12 to Robert Hess, and then said:

> "We further agree that Sarah Strouse and Katherine S. Salabes, *two of the partners,* shall jointly have control of *said partnership business* and direct the policy and management thereof and they shall have all the power and authority with respect to the conduct and control of said business as general partners would have under the provisions of Article 73A (Partnership) of the Maryland Code (1951 Edition)." (Emphasis added.)

We think the actions, agreements and conduct of the parties manifest a clear intention on their part to form a partnership to continue the business of the Company, and compel a finding that Lewis E. Hess is one of the partners. By the explicit terms of the 1928 agreement, the business was conducted as a partnership for some years. After the death of Meyer S. Salabes in 1953, there remained only one of the original partners under the 1928 agreement. A "partnership" requires the association of two or more persons, except when winding up its affairs. By the agreement of 1954, executed less than two months after Meyer's decease, the business was continued. It is significant to note that under this agreement Lewis E. Hess received 1/6 of the profits, that the "partnership" could not be sold, dissolved or terminated, except by the mutual consent of *all* of the parties, that Katherine Spear Salabes and George S. Salabes (neither of whom had ever been partners) were given joint control and authority to direct the policy and management of the "partnership," and that the "partnership" is referred to on nine different occasions. The appellant rather persuasively argues that it is very unlikely that one, under the circumstances as they have been set forth above, would be given the authority to prevent a sale or termination of the partnership, if the parties did not intend that he be a partner; and this, coupled with his formidable sharing in the profits and the other terms of

the agreement, shows clearly that the parties intended to form a new partnership to carry on the previous business of the Company. This question, however, we are not now called upon to answer.

If there be doubt as to whether or not the agreement of 1954 created a partnership among the parties thereto, there can, we think, be little, if any, that the contract of 1955 did. By this agreement, the parties expressly agreed that the "partnership trading as the Consolidated Loan Company" should continue until July 31, 1955, unless the "partnership" were sooner sold, dissolved or terminated by agreement of all of the parties; and that said "partnership" should continue thereafter for six months' periods, unless any one of the parties gave the others notice that he or she desired the "partnership" to terminate. If we accept the appellee's argument —that this was not a new partnership agreement, but merely a contract between the parties that the old partnership should continue to operate the Company—it would mean a holding that this agreement was a contract between the parties calling for a partnership, which consisted of only one partner (Meyer S. Salabes and Marie Hess being then deceased, and it being conceded by both sides that neither the legatees nor the personal representatives of Marie Hess or of Meyer S. Salabes became partners in the business merely because of their deaths. 68 C.J.S., *Partnership*, p. 803.), to continue the business, with the right in each party to the agreement to terminate the "partnership." If this were the true meaning of the contract, it is, indeed, a strange and unusual instrument.

But the contract goes on and shows that the above was not the intention of the parties. It states that the parties further agree "that Sarah Strouse and Katherine S. Salabes, two of the partners, shall jointly have control of said partnership business * * *." This is significant language. It definitely discloses that the parties were engaged in a "partnership business"; that Katherine S. Salabes was one of the "partners"; and that she and Sarah Strouse were not the only two partners. If Katherine S. Salabes were a partner at the time of the execution of this agreement (as was so

stated therein), this necessarily means that somewhere along the line she had to acquire that status. We have already pointed out that she did not, automatically, become a partner under the partnership agreement of 1928 by reason of her being the legatee of Meyer S. Salabes. How then did she become a partner? It seems clear to us that she became one by reason of the intention of the parties, as that intention is manifested by the actions, conduct and written agreements of the parties, as they have been set forth above (with particular emphasis on the agreement of 1955). It likewise seems clear to us that the parties did not regard Sarah Strouse and Katherine S. Salabes as the only partners. Had this been their intention, they would not have used the phraseology, "Sarah Strouse and Katherine S. Salabes, *two of the partners, * * *.*" (Emphasis added.) This language, we think, bears an obvious connotation that they were not the only two partners in the "partnership." Moreover, if they were the only two partners, the provisions of the contract, immediately following, that give them the joint "control of said partnership business" and such power and authority as "general partners" have under the pertinent provisions of the Maryland Code would have been meaningless; because, as the only two partners, they would have obtained these powers anyway, in the absence of anything in the agreement delegating them to someone else. If they were not the only two partners (and we have strongly indicated above that they were not), who are the remaining partners? The simple answer is: The other parties to the agreement of April 6, 1955.

We hold, after a careful consideration of all the acts, conduct and agreements, that the parties to the agreement of April 6, 1955, intended to, and did, create a partnership to conduct the business of the Consolidated Loan Company, and that Lewis E. Hess is one of the partners.

> *Decree reversed, and case remanded for the entry of a decree in conformity with this opinion. Costs to be paid by the Consolidated Loan Company.*