780 A.2d 396

Steven SHIPLEY, et al.

v.

Marvin PERLBERG, et al.

No. 1479, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 6, 2001.

Suzanne C. Shapiro (Saul E. Kerpelman & Associates, P.A., on the brief) Baltimore, for appellants.

Robert R. Smith (Franch, Jarashow, Burgmeier & Smith, P.A., on the brief) Annapolis, for appellees.

Argued before SALMON, ADKINS, and RAYMOND G. THIEME, Jr., (Retired, Specially Assigned) JJ.

ADKINS, Judge.

This case is about whether a corporate officer and director is individually liable for lead paint injuries to the resident of a corporately owned property. Steven Shipley, appellant, sued Marvin Perlberg ("Perlberg"), appellee, for injuries caused by lead paint poisoning while Shipley was residing at 1641 West Lafayette Avenue, in Baltimore City (the "subject property"). Perlberg denied any involvement with the renting of the subject property to Shipley's family, and moved for summary judgment. On August 21, 2000, the Circuit Court for Baltimore City granted Perlberg's motion.

On appeal, Shipley contends that the circuit court erred in granting Perlberg's motion and presents several questions for our review. First, he contends that there are sufficient facts in the record to create an inference that Perlberg "personally participated, inspired, cooperated and acquiesced in the tortious negligence of the corporate body." Second, he argues that the circuit court erred in refusing to admit a deposition taken in an unrelated civil action involving different parties, which he asserted would "create a material dispute of fact for the purpose of summary judgment." Finally, he contends that Perlberg is liable under the Baltimore City Housing Code and Maryland partnership law. Finding no evidentiary basis for imposing personal liability on Perlberg, we shall affirm the judgment of the circuit court.

## FACTS AND LEGAL PROCEEDINGS

The subject property was owned by Barbara Realty Corporation and managed by North Services Corporation. Shipley

resided at the property from April 1971 through October 4, 1973, while he was a young child.[1] While residing at the property, Shipley suffered elevated blood levels and was diagnosed with lead poisoning. On August 23, 1973, a lead violation notice was issued to Northern Brokerage Company, as the "owner or agent for" the subject property. Shipley and his family moved out of the residence in October 1973 and never returned.

In his complaint, Shipley alleged, *inter alia*, that Perlberg was personally liable because he directly controlled and made decisions concerning the management of the subject property. Perlberg moved for summary judgment contending, *inter alia*, that "he had no direct involvement in the subject premises, of any type." In support of his motion, Perlberg attached his deposition taken in the instant action.

During his deposition, Perlberg testified about his involvement with Barbara Realty and other real estate ventures undertaken by himself and his brother, Daniel Perlberg ("Daniel"). Perlberg said that he was in the real estate business in Baltimore from 1950 until his retirement in the early 1980's. He acknowledged that during this time period, Perlberg and Daniel were involved as officers and directors in a number of corporations that owned and sold property in Baltimore City, including Barbara Realty, Curley Realty, and Northern Brokerage Company. Perlberg asserted that Daniel handled the rental side of their businesses and that his activities were limited to the buying and selling of properties. He denied any involvement in the leasing or management of the subject property. Perlberg stated that he had never visited or inspected the subject property, had no knowledge of any violation notices, and never had any communication with Shipley or any other tenant of the property. He acknowledged that the telephone number for both his buying and selling business, and his brother's rental business was listed under the name Northern Brokerage Company. When calls

---

1. Shipley has since reached the age of majority.

would come in to Northern Brokerage, they would be routed upstairs to his separate line if they involved purchases or sales, or to his brother's line if they involved rentals. When asked whether Northern Brokerage "was actually ... on file with Maryland Department of Assessments and Taxation as a corporation," he replied, "I think so. I'm really not sure."

Shipley offered the deposition testimony of Daniel. This testimony was not taken in the instant action, but rather, in an unrelated 1991 case styled as *Alisha Holloway, et al. v. Wendy Perlberg, et al.*, No. 89026031/CL92259 in the Circuit Court for Baltimore City (the "Holloway case"). Neither Shipley nor Perlberg was a party to that case, which did not involve the subject property. In his deposition, Daniel testified that both he and Perlberg were personally involved in the rental and management of properties owned by a different corporation known as Curley Realty, which was formed in approximately 1955, and was still in operation at the time of the deposition in 1991. Daniel asserted that both he and Perlberg made decisions concerning rental properties for Curley Realty, and jointly made decisions concerning the maintenance of these properties. Daniel explained that both he and Perlberg would handle complaints about the Curley rental properties and would decide on an appropriate course of action. He acknowledged that Northern Brokerage was the name listed in the phone book for the telephone number used by Curley Realty. If a tenant of Curley Realty had a complaint, he or she would call the Northern Brokerage number, and either Daniel or Perlberg would take care of it.

After a hearing, the court granted Perlberg's motion for summary judgment. The court held that Daniel's deposition testimony was inadmissible because it involved "a different case, a different property, a different corporation and a different time period [and] because ... [Perlberg] would not have the opportunity to cross examine that testimony." The court further ruled that because the deposition testimony was inadmissible, Shipley failed to submit "any evidence that would be admissible that would reflect the fact that ... [Perlberg] did participate in the actions alleged in the Complaint." Accord-

ingly, the court granted Perlberg's motion for summary judgment. This appeal followed.

## DISCUSSION

Shipley contends that the trial court erred in granting Perlberg's motion for summary judgment. As a threshold matter, he argues that the court erred when it refused to consider the deposition testimony of Daniel taken in an unrelated case. He asserts that the court erred in determining there were no material facts that would support an inference that Perlberg is personally liable for his injuries. His contention is two-fold. First, he contends that the court erred in ruling that Perlberg had to have knowledge and participate in the actions alleged in the complaint. Second, he contends that a reasonable inference could be drawn from the evidence that Perlberg did, in fact, have knowledge and control over the actions that caused the damages alleged in the complaint. Shipley further contends, invoking the provisions of the Baltimore City Code and partnership law, that Perlberg is liable even if he did not participate in the alleged wrongful acts. We shall address Shipley's contentions in turn.

## I.

### Standard Of Review

Summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Md. Rule 2–501. In reviewing a trial court's grant of summary judgment, we must determine whether the trial court's ruling was legally correct. *See Heat & Power Corp. v. Air Prod. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990). "The purpose of the summary judgment procedure is to decide whether there is an issue of fact sufficiently material to be tried, not to try the case or to resolve factual disputes." *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 144, 642 A.2d 219 (1994). Nevertheless, "when the pleadings, depositions, admissions on file, and any affidavits show that there is no genuine dispute as to

any material fact and that the moving party is entitled to judgment as a matter of law, then the judgment shall be rendered forthwith." *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985).

## II.

### Perlberg's Tort Liability As Corporate Director

Shipley asserts that Perlberg is personally liable for his injuries based on Perlberg's status as a director of the corporation that leased the subject property. In making this general assertion, Shipley paints with a broad brush, and draws no distinction between Perlberg's status as a director and officer of Barbara Realty Corporation, the owner of the subject property, and his status as a director and officer of Northern Realty Company, the company that managed the subject property.

### A.

### "Participation" Standard For Holding Corporate Director Personally Liable

Shipley relies on several Maryland cases to support his claim that Perlberg may be held individually liable because he is a corporate officer and director. *See Metromedia Co. v. WCBM Maryland, Inc.,* 327 Md. 514, 610 A.2d 791 (1992); *Tedrow v. Deskin,* 265 Md. 546, 290 A.2d 799 (1972); *Levi v. Schwartz,* 201 Md. 575, 95 A.2d 322 (1953); *St. James Constr. Co. v. Morlock,* 89 Md.App. 217, 223, 597 A.2d 1042 (1991), *cert. denied,* 325 Md. 526, 601 A.2d 1100 (1992). None of these cases supports a holding that Perlberg was liable for the negligence of Barbara Realty simply because he was a corporate officer.

In *Levi v. Schwartz,* the Court of Appeals articulated the rule concerning the liability of a corporate officer for a tort committed by the corporation.

It is a generally accepted rule that an officer of a corporation who takes part in the commission of a tort by the

corporation is personally liable therefor, but an officer of a corporation who takes no part in the commission of a tort committed by the corporation is not personally liable unless he specifically directed the particular act to be done or participated or co-operated therein.

*Levi,* 201 Md. at 583, 95 A.2d 322.

In *Levi,* the officer purchased land and transferred it to a corporation. The corporation hired a third party to excavate the land. Evidence offered at trial indicated that the officer visited the site daily and gave orders. An adjoining landowner filed suit against the corporation and the officer individually to recover damages caused by the removal of soil supporting its lot. The Court affirmed the jury's verdict that the officer was personally liable because "[t]he evidence supports the theory that [the officer] participated in the alleged negligent and wrongful acts of the excavator." *Id.* at 584, 95 A.2d 322.

A similar result was reached in *Metromedia Co. v. WCBM Maryland, Inc.* Metromedia ordered a radio station, WCBM, to vacate premises that it sub-leased. WCBM's chief executive officer made the decision to refuse to vacate the premises. Metromedia filed an ejectment action in the circuit court against WCBM and its officer. Reversing the trial court's motion for judgment in favor of the officer, the Court held that "the evidence [Metromedia] offered was sufficient to establish that [the officer] . . . decided that WCBM would not vacate the premises notwithstanding its lack of any right to occupy it." *Metromedia Co.,* 327 Md. at 522, 610 A.2d 791.

 Nevertheless, an officer or director is not liable for torts of which the officer has no knowledge or to which the officer has not consented. *See Tedrow,* 265 Md. at 551, 290 A.2d 799. Rather, there must have been "upon [the officer's] part such a breach of duty as contributed to, or helped to bring about, the injury; he must have been a participant in the wrongful act." *Id.* This rule was applied in *Fletcher v. Havre de Grace Fireworks Co.,* 229 Md. 196, 177 A.2d 908 (1962). In *Fletcher,* a fireworks plant exploded. The explosion and resulting fire injured the plaintiff and damaged her

home. She sued the fireworks plant, as well as its officers and directors individually. The plaintiff's theory against the individual directors was that they were liable because they controlled the conduct of the business. The lower court sustained demurrers by the individual officers on the grounds that the plaintiff's allegations were "too general to charge [the directors] with liability." *Id.* at 199, 177 A.2d 908. The Court of Appeals affirmed this judgment, explaining:

> It is manifest, we think, that the allegation in the trespass *q.c.f.* count that the officer-director defendants had and exercised "complete direction and control over all phases of the conduct of the business of the defendant company," and the more comprehensive allegation of similar import in the negligence, extra-hazardous and nuisance counts, fall far short of alleging that the individual defendants had personally directed or actively participated or cooperated in the tort committed by the corporation.

*Id.* at 201, 177 A.2d 908.

In *St. James Construction,* the plaintiff homeowners sued the corporate builder of their home, and its president, individually, for the cost to repair a brick veneer wall that developed severe cracks and holes. The plaintiffs urged that the president was individually liable because a corporate officer may be held personally liable for torts committed by the corporation if that officer " 'either specifically directed, or actively participated or cooperated in', the corporation's negligent conduct." *St. James Constr.,* 89 Md.App. at 223, 597 A.2d 1042 (quoting *Fletcher,* 229 Md. at 201, 177 A.2d 908). Relying on *Tedrow,* the court held the officer liable because he chose the wood materials used in constructing the wall, and the use of wood to support a masonry wall caused the wall to fail.

In this case, we must apply these "participation" standards to determine whether Perlberg was entitled to summary judgment on the grounds that he did not participate in the corporate torts alleged in the complaint. For the reasons set forth below, we hold that the trial court correctly decided that (1) Perlberg offered sufficient evidence to show his lack of

participation in the management of Barbara Realty, and (2) Shipley failed to offer sufficient evidence to raise a dispute regarding Perlberg's lack of participation.

## B.

### Perlberg's Deposition Testimony Establishing His Lack Of Participation

To establish his lack of participation in corporate affairs, Perlberg offered his deposition testimony in support of summary judgment. In his deposition, Perlberg stated that, although he was involved in a variety of corporations that rented properties, he was not personally involved in the rental aspects of the businesses, and that he had no personal knowledge concerning the status of the rentals. He testified that he did not know Shipley and that he had never visited the subject property.

This testimony, standing alone, would satisfy Perlberg's initial burden of "present[ing] the material facts necessary to obtain judgment and demonstrate that there is no dispute as to any of those facts." *Fearnow v. Chesapeake & Potomac Tel. Co.*, 104 Md.App. 1, 48–49, 655 A.2d 1 (1995), *rev'd on other grounds*, 342 Md. 363, 676 A.2d 65 (1996). Therefore, because Perlberg set forth grounds sufficient for summary judgment, Shipley was required "to show with 'some precision' that there is a genuine dispute as to a material fact." *Bond v. Nibco, Inc.*, 96 Md.App. 127, 135, 623 A.2d 731 (1993) (quoting *Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 243, 603 A.2d 1357 (1992)).

## C.

### Shipley's Effort To Rebut Perlberg's Deposition Testimony

We turn to Shipley's attempt to rely on Daniel's deposition testimony in an unrelated case, in order to raise a disputed issue of material fact. The circuit court ruled that this deposition was inadmissible because it involved testimony

taken "(1) in another case; (2) dealing with a different property; (3) addressing a different corporation; and (4) a different time period."

We interpret the trial court's ruling on the admissibility of Daniel's deposition to embrace two subparts. First, the trial court held that the deposition was not admissible because it was taken in an unrelated case involving different parties, and, as the trial court said, "[Perlberg] would not have the opportunity to cross examine that testimony." Second, the deposition testimony did not meet the general requirement of relevance because it related to Curley Realty Corporation, which had no involvement with the subject property. We will examine each of these rulings in turn.

1.

### Admissibility Of Deposition Testimony In
### A Case Involving Different Parties

■ Maryland Rule 2–501(b) provides:

When a motion for summary judgment is supported by an affidavit **or other statement under oath,** an opposing party who desires to controvert any fact contained in it may not rest solely upon allegations contained in the pleadings, but shall support the response by an affidavit or **other written statement under oath.** (Emphasis added.)

A deposition, because it is a statement under oath, qualifies under Rule 2–501 as evidence that can controvert facts submitted under oath by the moving party. Seeking to carve out an exception from the general rule, Perlberg argues that Daniel's deposition was not admissible because it was taken in a case involving different parties. We do not agree that the difference in parties creates an exception to the general rule allowing the use of deposition testimony to oppose summary judgment.

The Court of Appeals recently addressed the issue of whether testimony taken in a previous proceeding could be used to defeat a motion for summary judgment. In *Imbraguglio v. Great Atlantic & Pacific Tea Co., Inc.*, 358 Md. 194,

747 A.2d 662 (2000), a worker was killed when he fell from a forklift-elevated pallet. The worker's wife sued to recover damages for her husband's death. In support of its motion for summary judgment, the employer offered the testimony of a manager at a workers' compensation hearing regarding the incident. The manager was employed by the decedent's employer, which was a party in the workers' compensation proceeding. The Court of Appeals held that the prior testimony was admissible in the summary judgment proceeding. It recognized that "[a] transcript of former testimony possesses the same indicia of reliability as an affidavit in the summary judgment context." *Id.* at 207, 747 A.2d 662.

*Imbraguglio* differed from the instant case, because there the workers' compensation action and the circuit court action involved the same parties and dealt with the same underlying event. Accordingly, the plaintiff against whom the manager's testimony was being offered in the civil lawsuit "had 'an opportunity and similar motive to develop [that] testimony by direct, cross, or redirect examination' in the workers' compensation proceeding." *Id.* at 206, 747 A.2d 662.

The *Imbraguglio* Court did recognize, however, that some courts have refused to evaluate a summary judgment motion by considering testimony taken in another action. *See Copeland v. Samford Univ.*, 686 So.2d 190 (Ala.1996); *Gatton v. A.P. Green Svcs., Inc.*, 64 Cal.App.4th 688, 75 Cal.Rptr.2d 523 (1998). The Court distinguished these cases because they "appear to involve the use of trial or deposition testimony from a previous case to which the plaintiff or defendant against whom the evidence was presented was not a party." *Imbraguglio*, 358 Md. at 209, 747 A.2d 662. In a narrow holding, the Court "indicate[d] no opinion" concerning whether testimony from such a non-party case would be admissible. *Id.*

The instant case presents the issue left unresolved in *Imbraguglio*, because Perlberg was not a party to the *Holloway* case in which Daniel's deposition was taken. Perlberg seizes upon *Imbraguglio's* distinction of *Copeland* and *Gatton*, urging that we adopt that distinction as our holding in this case.

After reviewing these cases and others addressing this issue, we decline to do so. We explain.

Other than the *Gatton* and *Copeland* cases cited by Perlberg, we found only three cases addressing the use of a certified deposition transcript from a previous case involving different parties.[2] *See United States v. O'Connell*, 890 F.2d 563, 567 (1st Cir.1989); *Leake v. Jones*, 18 F.R.D. 80, 87 (W.D.Okla.1955); *Farmers Union Oil Co. of Williston v. Harp*, 462 N.W.2d 152 (N.D.1990). Although all three allowed use of the non-party transcripts, two did so without commenting on the fact that the transcripts involved different parties. *See O'Connell*, 890 F.2d at 567; *Leake*, 18 F.R.D. at 87. The third offers persuasive reasoning justifying the use of such non-party deposition testimony:

> [Appellee] asserts that the prior trial testimony of [the witness] is inadmissible for consideration in the present action because [appellee] was not a party to the prior action and had no opportunity to cross-examine [the witness]. While [appellee's] assertion that he had no opportunity to cross-examine [that witness] is correct, it is not relevant. **Affidavits submitted in support of, or opposing, summary judgment are never subject to cross-examination. Certainly, the degree of reliability attending [the witness'] sworn testimony from the prior trial is as great as the degree of reliability attending the sworn statements submitted by [appellee] in the present action.**

*Farmers' Union Oil Co.*, 462 N.W.2d at 155 (emphasis added).

Similar considerations cause us to reject appellant's argument that we should follow *Copeland* and *Gatton* by limiting

---

**2.** Commentators have not explicitly addressed whether the rule should be different when depositions involving different parties are offered to oppose summary judgment. *See* P. Niemeyer & L. Schuett, *Maryland Rules Commentary* 332 (2d ed.1992); 10A–C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure*, § 2722 (3d ed.1998) (stating only generally that "depositions taken for purposes of another case also may be utilized"); J. Moore, *Moore's Federal Practice* ¶ 56.22 (2d ed. 1965) ("There is no reason why a certified transcript may not be considered as an affidavit of the witnesses, assuming they were under oath at the time").

the use of depositions to those involving the same parties. In *Gatton,* the intermediate California appellate court rejected the use of a non-party deposition on the grounds that, unlike evidence presented by affidavit, "there are questions whether the [deposition] witness, even if alive, can testify competently to the deposition's contents. Memories fade, especially with a deposition like the one here, which was 10 years old...." *Gatton,* 75 Cal.Rptr.2d at 528. We do not share the reservations of the California court for two reasons.

First, a deposition transcript is always subject to exclusion on the grounds that the testimony contained therein would not be admissible at trial. *See Imbraguglio,* 358 Md. at 206, 747 A.2d 662. For example, the deposition of a deceased or otherwise unavailable person could not be used at trial or on summary judgment unless the requirements of Md. Rule 5–804(b) were met. This rule allows the use of hearsay from an unavailable witness only if the party against whom the testimony is offered had an opportunity to "develop the testimony by direct, cross, or redirect examination." *Id.*

Second, the fading memory problem raised by the *Gatton* court is simply not something that should be addressed on summary judgment. Witnesses at trial are permitted, and often do, testify about matters that occurred in the distant past. Effective cross-examination serves to bring out weak or biased memories, and the trier of fact judges the weight of that testimony in light of any weaknesses exposed by such cross-examination.

 Our analysis, like the North Dakota court in *Farmers' Union Oil Co.,* rests on a consideration of the purpose of the summary judgment rule. The purpose of the rule is to dispose of cases if there is no genuine factual controversy. *See Brewer v. Mele,* 267 Md. 437, 442, 298 A.2d 156 (1972). Its purpose is not to try the case or resolve factual disputes, but rather to determine whether there is a factual controversy requiring a trial. *See Goodwich v. Sinai Hosp. of Baltimore,* 343 Md. 185, 205–06, 680 A.2d 1067 (1996). The purpose of cross-examination, on the other hand, is to elicit the truth,

*Glover v. Gar–Bern Bldg. & Dev. Co.*, 264 Md. 388, 391, 287 A.2d 29 (1972), thereby resolving factual disputes. At the summary judgment stage of a case, it is not critical that the party opposing use of a deposition transcript have an opportunity to ferret out the truth of the facts asserted by its opponent through cross-examination. The summary judgment rule contemplates that summary judgment may be predicated on an affidavit by a non-party affiant who has not been cross-examined. We do not see why the rule should be different for deposition testimony by a non-party. The lack of opportunity to cross-examine the non-party deponent goes to the weight of the proffered testimony, not to its admissibility.[3] Accordingly, we do not agree with Perlberg that the fact that he was not a party to the litigation in which Daniel's deposition was taken, by itself, made that deposition testimony inadmissible in the summary judgment proceedings involving Shipley.

## 2.

### Relevancy Of Daniel's Deposition Testimony

To be used in support of or opposition to a summary judgment motion, evidence must be relevant. *See Imbraguglio*, 358 Md. at 206, 747 A.2d 662. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. In an effort to establish the relevancy of Daniel's deposition testimony, Shipley asserts that

> Daniel Perlberg unequivocally states that both he and his brother, Marvin Perlberg, were equally in charge, care and control of the rental premises and their management. Both

---

**3.** Perlberg also argues that our recent holding in *Forrest v. P & L Real Estate Invest. Co.*, 134 Md.App. 371, 759 A.2d 1187 (2000), supports his view that depositions cannot be used in summary judgment if they are from prior cases and the opponent of the deposition's use was not a party to that case. *Forrest* is not applicable, however, because it involved the admissibility of the deposition at trial, not on summary judgment.

brothers made all decisions jointly with regard to operation and maintenance of the properties.

This characterization of Daniel's testimony is simply not accurate. Daniel asserted no less than four times in his deposition that his answers were addressing only Curley Realty, and not any other corporations that he may have been involved in with his brother.[4] Daniel's testimony does not provide evidence of Perlberg's involvement with the subject property. The *Holloway* case involved a plaintiff who lived at 3709 Spaulding Avenue in 1980. That property was owned and managed by Curley Realty Corporation. In contrast, the alleged wrongful action in the instant case occurred between 1971 and 1973 at a property located at 1641 West Lafayette Avenue. During the relevant time period, the subject property was owned by Barbara Realty Corporation and managed by North Service Corporation. The *Holloway* deposition does not establish a nexus between the brothers' activities involving Curley Realty in 1980 and their activities involving Barbara Realty and North Services Corporation between 1971 and 1973.

Notwithstanding Shipley's mischaracterization of Daniel's testimony, we recognize that Shipley is arguing that Daniel's testimony about Perlberg's activities is relevant in this case because of a "Northern Brokerage link." Shipley points to

---

4. These self-imposed limitations on his testimony included the following:

Q: What are some of the other corporate names that you operate under?
A: I think you're—this is dealing with Curley Realty, don't ask what the—that's all I want to deal with now.

. . .

Q: How many corporations—well, tell me the names of different corporations? . . .
A. Well, I won't give you the names. I just want to deal with the Curley Realty corporation. . . .
Q. Is Wendy Perlberg an officer of [Prime Services Corporation]?
A. . . . [Y]ou're suing Curley Realty, I feel I don't have to answer questions on other corporations. . . .
Q. But right now you're refusing to answer, yes?
A. I'll answer on Curley Realty what you want if I know the answers.

testimony about Northern Brokerage Company as the common link between Daniel's deposition in *Holloway* and Perlberg's deposition in the instant case. In his *Holloway* deposition, Daniel testified that Northern Brokerage Company was the name listed in the telephone book for the telephone number used by Curley Realty. Perlberg, similarly, said in his deposition that Northern Brokerage Company was the telephone listing for the number used to reach him and his brother through their various corporations. Perlberg explained that when a call came into the receptionist, she would refer it to him if it involved the purchase or sale of property. If it involved rentals, it would be referred to his brother. He also characterized Northern Brokerage as a "trade name" for the various companies.

Shipley attempts to persuade us that the use of the common trade name by both Curley Realty and Barbara Realty is sufficient reason to ignore the role distinctions made in the deposition testimony. He seeks to transform Daniel's testimony about Curley Realty, and its decision-making practices, into testimony about the decision-making practices of Barbara Realty, the owner of the subject property, or North Services Corporation, its manager. Under this theory, he would have us hold that Daniel's testimony was relevant, admissible, and sufficient to satisfy his burden to rebut Perlberg's testimony that he had no involvement with the rental side of the business. We do not ascribe such broad significance to the testimony about Northern Brokerage Company, its use as a trade name, or the sharing of a telephone listing by the separate corporations.

The mere use of a joint trade name and telephone number does not negate deposition testimony that there were two separate corporations, or allow an inference that the two corporations operated with the same decision-making process. Nor do we believe that a trier of fact could draw a reasonable inference that because Perlberg participated in rental decisions about Curley Realty properties, he also participated in rental decisions about Barbara Realty properties, including the subject property. At best, from Shipley's vantage point,

Daniel's testimony about the decision-making involving Curley Realty could be construed as inconsistent with Perlberg's general testimony eight years later about a number of Perlberg's corporations, including Curley Realty. Even if we did so, we would also have to assume that the brothers were talking about the same time periods. This case, however, is not about Curley Realty; it is about Barbara Realty and North Services Corporation, and whether Perlberg is personally liable for the alleged negligence of the latter two corporations.

Shipley produced no evidence that Perlberg actively participated in decisions relating to the maintenance of the subject property, or the existence of lead paint thereon. Absent such evidence, Perlberg cannot be held liable for the negligent acts of the corporation in permitting lead paint to remain on the subject property. *See Tedrow*, 265 Md. at 551, 290 A.2d 799; *Levi*, 201 Md. at 583, 95 A.2d 322.

## III.

### Shipley's Alternate Theories Of Liability

Shipley further contends that "[i]t is really inconsequential [whether Perlberg] personally participated in management and rental of the properties." He provides two separate theories in support of this contention. First, he argues that Perlberg is personally liable under the Baltimore City Housing Code. Second, he presents a partnership theory of liability and argues that "a trier of fact could find that both Marvin Perlberg and Daniel Perlberg were partners when operating under the trade name of Northern Brokerage," and that "each brother is responsible for and bound by any wrongful act or omission in the course of partnership business." For the reasons that follow, we find both of appellant's theories unpersuasive.

### A.

### The Baltimore City Housing Code

Shipley contends that Perlberg is liable for his injuries under the Baltimore City Housing Code. The Code

provides that "[a]ny person who is either an owner or operator of a property subject to this Code shall be responsible for compliance with all of the provisions of the code." Baltimore City Code (1976, 1986 Repl.Vol.), Art. 13, § 310(a)(1). Under Shipley's theory, Perlberg is liable because "[n]umerous facts in the record would allow a fact-finder to properly infer that [Perlberg] personally was an operator of the subject rental premises, and thus owed a duty to the occupants of the rental property to comply with the Baltimore City Housing Code." We find Shipley's contention without merit and explain. The cardinal rule in statutory construction is to ascertain and carry out the true intention of the legislature. *See Hyle v. Motor Vehicle Admin.*, 348 Md. 143, 148, 702 A.2d 760 (1997). In determining legislative intention, we look to the general purpose, aim, or policy behind the statute. *See Condon v. Univ. of Maryland*, 332 Md. 481, 491, 632 A.2d 753 (1993). Ordinarily, we look to the words of the statute to determine intent. *See Gordon Family P'ship v. Gar on Jer*, 348 Md. 129, 137, 702 A.2d 753 (1997). Nevertheless, "while the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body." *Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590 (1992).

■ Perlberg is not liable under section 310(a) because he was neither the "owner" nor "operator" of the subject property. The Baltimore City Code defines "owner" as "any person, firm, corporation, guardian, conservator, receiver, trustee, executor, or other judicial officer, who ... owns, holds, or controls the whole or any part of the freehold or leasehold title to any dwelling or dwelling unit, with or without accompanying actual possession thereof[.]" Balt. City Code, Art. 13, § 105(jj). The evidence is undisputed that Barbara Realty Corporation owned the subject property during the relevant time period. There is no evidence that Perlberg had title to the subject property or exercised ownership in the manner contemplated by the Code.

Nor was Perlberg an "operator" of the premises. Under the Baltimore City Code, section 105(hh) "operator"

(1) shall mean any person who has charge, care, or control of a building or part thereof, in which dwelling units or rooming units are let or offered for occupancy; and

(2) shall include a lessee, sub-lessee, any vendee in possession, or any other person otherwise managing or operating such building or part thereof.

There was no evidence that Perlberg had "charge, care, or control" over the property. Perlberg testified that he was not involved in renting properties and had never visited the subject property. As discussed, Shipley has not produced any admissible evidence that would refute Perlberg's assertions.

Shipley posits that Perlberg would be liable as an "operator" because he was involved with the establishment of Barbara Realty, North Service Corporation, and Northern Brokerage Company, and acted as a director and officer of these corporations. Neither subsections (a) or (b) of section 310 contemplate such a result. Indeed, section 310(b) addresses the liability of individual officers and directors of a corporation for violation of the Code. It provides:

Whenever a corporation shall violate any of the provisions of this Code, such violation shall be deemed to be also that of the individual directors, officers, or agents of such corporation who shall have authorized, ordered, or done any of the acts constituting in whole or in part such violation or who shall knowingly have acquiesced in any failure to act constituting in whole or in part such violation. . . .

Balt. City Code, Art. 13, § 310(b)

To prove liability under section 310(b), a plaintiff must show that the individual defendant at least had knowledge of and acquiesced in the wrong committed. To hold a person liable under section 310(a) merely because he or she was involved in setting up a corporation, or acted as officer or director, would be inconsistent with the requirements of section 310(b). We will not interpret section 310 in a manner that promotes this inconsistency. *See, e.g., Barr v. State,* 101 Md.App. 681, 687,

647 A.2d 1293 (1994) ("courts must read all parts of a statute together, with a view toward harmonizing the various parts and avoiding both inconsistencies and senseless results that could not reasonably have been intended by the Legislature"). We hold, therefore, that Perlberg is not liable under section 310(a) of the Baltimore City Code.

## B.

### Partnership Law

■ Shipley's final contention is that Northern Brokerage is a partnership, and thus Perlberg is liable for any tort committed by Northern Brokerage under Md.Code (1975, 1999 Repl.Vol.), section 9–307(a) of the Corporations and Associations Article, addressing partnership liability. It provides:

[A]ll partners are liable:

(1) Jointly and severally for everything chargeable to the partnership under §§ 9–305 [partnership bound by partner's "wrongful act or omission" in the course of partnership business] and 9–306 [partnership bound by partners' breach of trust]; and

(2) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract.

■ A partnership exists " 'only when it is the intention of the parties that they should be partners.' " *Collier v. Collier*, 182 Md. 82, 88, 32 A.2d 469 (1943)(quoting *Southern Can Co. v. Sayler*, 152 Md. 303, 314, 136 A. 624 (1927)). When two persons agree to carry on a business for their mutual benefit, one to furnish the capital and the other to perform the services, and to share any profits that might be derived from the business, they are partners. *See McBriety v. Phillips*, 180 Md. 569, 574, 26 A.2d 400 (1942). In determining whether a partnership exists, consideration should be taken of the intention of the parties, their community of interests, and their sharing of profits, capital, and control. *Southern Can Co.*, 152 Md. at 313–15, 136 A. 624. The existence of a partnership will not be presumed, but must be proved. *See Miller v. Salabes*,

225 Md. 53, 55, 169 A.2d 671 (1961). "The burden of proving a partnership is upon the party who asserts it." *LaRoque v. LaHood,* 93 Md.App. 625, 643, 613 A.2d 1033 (1992), *cert. denied,* 329 Md. 337, 619 A.2d 546 (1993).

The record is void of any evidence that would create an inference that Perlberg was in a partnership with Daniel Perlberg. There is no evidence that they intended to be partners, and no evidence about the contribution of capital or the sharing of profits from any partnership. To the contrary, the only evidence relating to their participation in businesses together is that they were officers of various corporations.

The evidence about Northern Brokerage Company is not sufficient to allow a factual inference that it was a partnership or that Perlberg and Daniel were its partners. There was no evidence that Northern Brokerage conducted business operations, had capital, or earned profits. The only evidence about Northern Brokerage's business operations is that the telephone listing for Perlberg's various corporations was listed under the trade name "Northern Brokerage." Contrary to the claim that Northern Brokerage was a partnership, Perlberg testified that he was a corporate officer of Northern Brokerage Company. To be sure, when asked whether "Northern Brokerage [was] a corporation," he responded, "Yes, I think so." When pressed to answer whether "[i]t's actually been on file with Maryland Department of Assessments and Taxation as a corporation," he again said, "I think so." In the absence of any other evidence about a sharing of profits, business operations, or intent to be partners, however, any lack of certainty about the corporate filings relating to Northern Brokerage is not a substitute for substantive evidence of partnership.

### Conclusion

In a final effort to persuade us, Shipley warns of dire consequences if we affirm this summary judgment.

To allow Marvin Perlberg to escape personal liability under the facts of this case would open the door for all landlords to escape the consequences of tortious negligence by acting

always through the corporate form. From this point forward, every landlord will be encouraged to place his or her rental properties in uninsured shell corporations. Landlords acting through the corporate form will no longer be encouraged to comply with the Baltimore City Housing [c]ode in an effort to prevent inner city children from becoming lead poisoned, because they will be able to cite to this case for authority that they cannot be held personally liable for negligent conduct of a corporation[.]

We do not see our decision nearly so broadly. Rather, what we see here is a simple failure of proof. The problem with Shipley's defense of the motion for summary judgment was that he offered no admissible and relevant evidence to rebut Perlberg's testimony about the operations of Barbara Realty.

We also see that Shipley had ample opportunity to obtain such evidence. This case, filed in 1988, has been active since 1996. In the eight years between filing and 1996, there were intermittent skirmishes between the parties regarding whether Perlberg had been served. The motion for summary judgment was not filed until June 2000. Sometime in the twelve years since Shipley filed this action, there were opportunities to learn more about the operations of Barbara Realty and the role of Perlberg. For example, Shipley could have taken a deposition of Daniel and asked him about the operations of Barbara Realty. Alternatively, he could have interviewed or taken depositions of tradespeople who dealt with Barbara Realty, or other employees of the corporation. Both a secretary and a property manager were mentioned in the record. Other tenants of Barbara Realty might have been located. Such investigation might have disclosed more about Perlberg's participation in Barbara Realty.

Both common law and the Baltimore City Code provide a mechanism for imposing personal liability on principals who are involved in the commission of corporate torts. Here, there was simply no evidence that Perlberg participated, directed, or acquiesced in the alleged corporate failure to maintain the subject property free of lead paint. Our conclu-

sion has no import for other cases in which the plaintiff offers evidence regarding who was acting for the corporation. We believe the common law and Baltimore City Housing Code are broad enough to reach individuals who commit wrongful acts as officers or agents of corporations. We see no foundation in the common law or the Baltimore City Code, however, for imposing personal liability without any proof of such personal involvement in the tortious act.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**