991 A.2d 1216

Monica ALLEN, Individually, etc., et al.

v.

Jay DACKMAN.

Court of Appeals of Maryland.

March 22, 2010.

Reconsideration Denied May 6, 2010.

Brian S. Brown (Saul E. Kerpelman & Associates, P.A., Baltimore, MD), on brief, for Petitioners.

James R. Benjamin, Jr. (Hodes, Pessin & Katz, P.A., Towson, MD), on brief, for Respondent.

Brief of Amici Curiae, Maryland Multi-Housing Ass'n, the Property Owners Ass'n of Greater Baltimore, Inc., the Property Owners Ass'n of Maryland, Inc., the Maryland Ass'n of Realtors, and the Apartment and Office Building Ass'n. Charles I. Joseph, Esquire Shaw & Morrow, P.A., Towson, MD

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, BARBERA and ADKINS, JJ.

GREENE, Judge.

Petitioners, Monica Allen and Shantese Thomas, by their mother and next-friend, Monica D. Allen,[1] allege that they suffered injuries caused by lead paint while living at a property owned by Hard Assets, LLC ("Hard Assets"). We have been asked to determine whether Jay Dackman ("Respondent"), a member of Hard Assets when it owned the property,[2]

---

**1.** Monica D. Allen also alleged injuries of her own stemming from the injuries allegedly suffered by Monica Allen and Shantese Thomas.

**2.** Hard Assets, LLC ("Hard Assets"), is a limited liability company ("LLC"). An LLC is "a permitted form of unincorporated business

may be held liable for these alleged injuries. Respondent's involvement with the property was limited, as he never visited the property and only dealt with the property through Hard Assets. In addition, Respondent and Hard Assets never intended to lease the property to anyone, were unaware that Petitioners were occupying the property until after Hard Assets acquired it, and successfully took legal action to remove Petitioners from the property. The trial court granted summary judgment in favor of Respondent, concluding that he could not be held liable as a matter of law, and the Court of Special Appeals affirmed that judgment.

Contrary to the position taken by the Circuit Court and the Court of Special Appeals, we conclude that Respondent could be held liable on the basis of the facts alleged in this case. The Baltimore City Housing Code [3] ("Housing Code") imposed

---

organization which is organized and existing under" Title 4A of the Corporations and Associations Article. Md.Code (1975, 2007 Repl. Vol.), § 4A–101(*l*) of the Corporations & Associations Article.

Jay Dackman ("Respondent") was a member of Hard Assets and was responsible for managing its day-to-day affairs during the time period relevant to this case. A member of an LLC is "a person with an interest in a limited liability company with the rights and obligations specified under" Title 4A of the Corporations and Associations Article. § 4A–101(n) of the Corporations & Associations Article. A member of an LLC is not "personally liable for the obligations of the limited liability company, whether arising in contract, tort or otherwise, solely by reason of being a member of the [LLC]." § 4A–301 of the Corporations & Associations Article. As discussed in this opinion, however, a member of an LLC is liable for torts he or she "personally commit[s], or which [he or she] inspire[s] or participate[s] in, even though performed in the name of an artificial body." *Metromedia v. WCBM Maryland,* 327 Md. 514, 519–22, 610 A.2d 791, 794–95 (1992) (quoting *Tedrow v. Deskin,* 265 Md. 546, 550, 290 A.2d 799, 802–03 (1972)).

3. When we refer to the Baltimore City Housing Code ("Housing Code") in this opinion, we are referring to the Housing Code as it existed during the time period applicable to this case: March 16, 2000, to October 23, 2000. In 2002, the Baltimore City Council ("City Council") repealed Division V of Article 13 of the Baltimore City Code, which comprised the Housing Code. Balt. City Code (2000, 2003 Supp.), Art. 13, Division V. The City Council subsequently enacted the Building, Fire, and Related Codes of Baltimore City, which includes a Property Management Code that now addresses many of the topics that were addressed in the Housing Code. Balt. City Code, Art. 13, Division

liability on, among other entities, any individual who "owns, holds, or controls" the title to a dwelling. Under the facts of this case, a reasonable trier of fact could find that Respondent controlled the title to the property at issue. A reasonable trier of fact could also find that Respondent personally committed, inspired, or participated in the tort alleged in this case, which would make him personally liable for Petitioners' alleged injuries, even though he was acting as a member of a limited liability company ("LLC"). Finally, we hold that Respondent owed a duty to Petitioners under the Housing Code, even assuming that Petitioners had no legal right to possess the property and that neither Respondent nor Hard Assets intended to lease the property. We therefore conclude that the trial court should not have granted Respondent's motion for summary judgment.

## I.

### Procedural History

This case originated in the Circuit Court for Baltimore City. Monica D. Allen filed suit against Respondent, Hard Assets, and others[4] on behalf of two minors, Monica Allen and Shantese Thomas ("Petitioners"). Petitioners alleged that they had been injured by lead-based paint while they lived at 3143 Elmora Avenue ("the property"). They further alleged that Respondent and Hard Assets, as owners of the property at some time when they lived there, had violated the Maryland Consumer Protection Act ("CPA") and had negligently failed to maintain the property.[5]

---

V. This opinion is not intended to be an interpretation of this newer code.

**4.** Only Petitioners' claims against Respondent are before this Court.

**5.** In their complaint, Petitioners alleged a number of injuries that they claim were caused by exposure to lead paint. The allegations relevant to our decision were that Monica Allen and Shantese Thomas, the infant petitioners, had suffered injuries due to Respondent's "failing to properly maintain the common areas of the dwelling so as to be free of loose, flaking lead based paint...." Petitioners also alleged that Moni-

Respondent filed a motion for summary judgment on June 20, 2005, arguing that he could not be held personally liable as a matter of law. The trial court granted Respondent's motion. Petitioners subsequently filed a timely notice of appeal to the Court of Special Appeals, challenging the grant of summary judgment as to Respondent. The intermediate appellate court affirmed the trial court's judgment, concluding that Respondent could not be held liable for negligence, as a matter of law, because he was not an "owner" or "operator" of the property as defined by the Housing Code and because he could not be held liable for the negligence allegedly committed by Hard Assets, an LLC. The intermediate appellate court also concluded that Respondent could not be held liable under the CPA because neither he nor Hard Assets had entered into a lease with Petitioners or their family. In regard to the Housing Code issue, Petitioners subsequently petitioned this Court for a writ of certiorari, which we granted. *Allen v. Dackman*, 408 Md. 487, 970 A.2d 892 (2009).

### Facts

The events that led to this suit are not in dispute. We shall therefore adopt the statement of the facts set forth by the Court of Special Appeals in its opinion below:

Monica Allen was born on September 8, 1996, and Shantese Thomas was born on January 23, 1998. Sometime in 1999, [Petitioners] moved into the property in question, where the children's grandmother, Tracy Allen ("Ms. Allen"), had been residing since the summer of 1998. According to Ms. Allen, before she moved into the property, she entered into a lease with Mildred Thompkins, the owner of

---

ca D. Allen had suffered injuries "as a result of the wrongful and negligent acts and omissions of" Respondent.

In regard to Respondent's personal liability, Petitioners alleged that Respondent "owned and/or controlled and/or managed" the property, or that Respondent, "if sued in the capacity of a present or former corporate officer of a corporation, which owned [the property], did personally participate in, inspire and/or induce the tortious acts or omissions...."

record at that time. Ms. Thompkins was still the owner of record when [Petitioners] moved into the property in 1999.

Ms. Thompkins later failed to pay taxes on the property and on March 16, 2000, Hard Assets acquired the property from Ms. Thompkins in lieu of the foreclosure. [Respondent] was one of two members of Hard Assets. Over the course of [Respondent's] 15 years in purchasing tax liens, it was his practice to sell the properties he acquired "as is," rather than keeping them as rental properties. Therefore, when Hard Assets obtained title, it did not intend to lease the property, nor were its members aware that [Petitioners] or Ms. Allen were living at the property.

Once Hard Assets became aware that [Petitioners] and Ms. Allen were residing at the property, Hard Assets advised them that they were not supposed to be there. Hard Assets informed [Petitioners] and Ms. Allen that they had 30 days to vacate the premises. After 30 days, [Petitioners] and Ms. Allen had not vacated the property. On June 27, 2000, Hard Assets filed a forcible entry and wrongful detainer complaint against Ms. Allen in the District Court for Baltimore City to have her and [Petitioners] removed from the property. [Respondent] signed the complaint on behalf of Hard Assets.

On August 18, 2000, judgment was entered in favor of Hard Assets when the district court found that Ms. Allen was wrongfully in possession of the property. Thereafter, Ms. Allen and [Petitioners] continued to stay in the property, and on September 28, 2000, a petition for warrant of restitution was filed. That petition was subsequently granted, and Ms. Allen and [Petitioners] were forcibly removed from the property on or about October 23, 2000.

Hard Assets sold the property on March 16, 2001. During the one-year period that it held title to the property, Hard Assets did not receive rent nor did it file collections for rent. Likewise, Ms. Allen did not pay rent to Hard Assets. Ms. Allen did not speak to Hard Assets or its representatives, and was not aware of who Hard Assets

was. Similarly, Monica D. Allen did not know Hard Assets or [Respondent].

From March 16, 2000 to March 16, 2001, [Respondent] was responsible for running the day-to-day business affairs of Hard Assets. The majority of the business involved the "as is" sale of properties that were purchased and acquired through tax liens. [Respondent] never set foot inside the property.

While residing at the property, each of the minor children suffered elevated blood-lead levels. Some of their elevated levels occurred before Hard Assets acquired the property, and some occurred after Hard Assets sold the property. Both minor children suffered from their highest blood-lead levels while Hard Assets held legal title to the property. As a result, [Petitioners] filed a complaint against Hard Assets and [Respondent] on June 11, 2002.

On June 20, 2005, [Respondent] filed a motion for summary judgment, asserting that he could not be held individually liable because: (1) he did not lease the property to [Petitioners]; (2) he was a member of Hard Assets, a limited liability company; (3) he had no knowledge of the alleged tort; and (4) he could not be held liable under the CPA.

*Allen v. Dackman,* 184 Md.App. 1, 2–6, 964 A.2d 210, 212–13 (2009) (footnote omitted).

The trial court granted Respondent's motion for summary judgment, concluding that Respondent could not be held personally liable for any claims asserted by Petitioners and that there was no evidence showing that Respondent had a landlord-tenant relationship with Petitioners or their family. Petitioners noted a timely appeal to the Court of Special Appeals, which affirmed the judgment of the trial court. *Allen,* 184 Md.App. at 10, 964 A.2d at 215. As to the request for *certiorari* filed in this Court, Petitioners present only one question, which we have reformulated: [6]

---

6. In their petition for certiorari, Petitioners presented this question:

Was the lower court incorrect in affirming summary judgment in favor of Respondent because he did not own, hold, or control title to the property at issue in this case?

After receiving briefs and hearing arguments from both parties,[7] we shall answer this question in the affirmative.[8]

## II.

### Discussion

To decide this case, we must interpret the Housing Code and determine whether Respondent could be held individually liable for Petitioners' alleged injuries. The parties agree that Respondent was a member of, and managed the day-to-day affairs of, Hard Assets when it owned the property. The parties also agree that Hard Assets owned the property for some of the time when Petitioners lived there. Respondent argues, however, that he cannot be held liable for Petitioners' alleged injuries because he has no personal liability for those injuries and because he owed no duty to Petitioners. The trial court and the Court of Special Appeals both agreed with Respondent, holding that, as a matter of law, Respondent could not be held liable. We disagree. Instead, we hold that Respondent could be held liable for Petitioners' injuries because a reasonable trier of fact could find that he was an "owner" of the property, as the Housing Code defined that term, and could find that he personally committed, inspired, or participated in the tort alleged in this case. We also hold that

---

Does a person need to possess "the legal right to sell and convey title to [a] property" in order to be an "owner" as that term is defined by the Baltimore City Housing Code.

**7.** We also received a joint *amicus curiae* brief from the Maryland Multi–Housing Association, the Property Owners Association of Greater Baltimore, Inc., the Maryland Association of Realtors, the Apartment and Office Building Association, and the Property Owners Association of Maryland, Inc. ("Amici").

**8.** We have not been asked to consider whether the Court of Special Appeals correctly affirmed the trial court's grant of summary judgment in regard to Petitioners' claim under the Maryland Consumer Protection Act.

if the trier of fact finds that Respondent was an "owner" of the property, as the Housing Code defined that term, then Respondent owed a duty to Petitioners under the Code. Accordingly, we conclude that the trial court erred when it granted summary judgment in favor of Respondent.

This case primarily involves a question of statutory construction. We explained our approach to statutory construction in a case involving statutory language almost identical to the language at issue in this case. We said:

> The goal with which we approach the interpretation of a statute is to determine the intention of the Legislature in enacting it. The rules governing the conduct of that search are well settled and have been stated by this Court on many occasions....
>
> We begin our analysis by reviewing the pertinent rules [of statutory construction]. Of course, the cardinal rule is to ascertain and effectuate legislative intent. To this end, we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there also.
>
> Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to reflect an intent not evidenced in that language, nor may it construe the statute with forced or subtle interpretations that limit or extend its application. Moreover, whenever possible, a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory.
>
> We have also recognized that a statute whose terms are unambiguous when considered by itself, may be rendered ambiguous when viewed in light of a related statute or when it is part of a larger statutory scheme. The application of these canons to the interpretation of the statute at issue produces a clear, logical and predictable result.

*Dyer v. Warren Real Estate,* 371 Md. 576, 580–82, 810 A.2d 938, 941–42 (2002) (citations and quotations omitted).

With these principles in mind, we begin our interpretation of the Housing Code by considering the intent of the Baltimore City Council ("City Council") in enacting it. By its own terms, the Housing Code was intended, among other things, to "establish and maintain basic minimum requirements, standards, and conditions essential for the protection of the health, safety, morals, and general welfare of the public and of the owners and occupants of dwellings in the City of Baltimore," to "establish minimum standards governing the condition, use, operation, occupancy, and maintenance of dwellings ... in order to make dwellings safe, sanitary, and fit for human habitation," and to "fix certain responsibilities and duties of owners, operators, agents, and occupants of dwellings." Balt. City Code (2000, 2002 Supp.), Art. 13, § 103(a). An "occupant," identified in these provisions as being protected by the Code, was defined as "the person who actually uses or has possession of the premises." Balt. City Code, Art. 13, § 105(gg). The Housing Code also provided that it was "the intention of the Mayor and City Council that this Code be liberally construed to effectuate [its] purposes...." Balt. City Code, Art. 13, § 103(b). By its terms, it declared that it was "remedial and essential to the public interest." Balt. City Code, Art. 13, § 103(b). Specifically regarding the application of the Housing Code to lead paint injuries, we have explained that the Code was enacted "to protect children from lead paint poisoning by putting [owners] on notice of conditions which could enhance the risk of such injuries." *Brown v. Dermer*, 357 Md. 344, 367, 744 A.2d 47, 60 (2000), *overruled in part on other grounds by Brooks v. Lewin Realty*, 378 Md. 70, 835 A.2d 616 (2003).

To carry out these purposes, the Housing Code established liability for entities that failed to follow the Code's requirements. In *Brooks*, we discussed extensively the proof required to establish liability for negligence based on violations of the Housing Code. We explained the common law rule that a plaintiff may establish a *prima facie* case of negligence by showing: "(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the

plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks,* 378 Md. at 79, 835 A.2d at 621; *see also Polakoff v. Turner,* 385 Md. 467, 475–77, 869 A.2d 837, 843 (2005) (reaffirming *Brooks).* If a plaintiff establishes these two elements, there is "sufficient evidence to warrant the court in submitting the case to the jury on the question of the [defendant's] negligence." [9] *Brooks,* 378 Md. at 79, 835 A.2d at 621 (quoting *Crunkilton v. Hook,* 185 Md. 1, 4, 42 A.2d 517, 519 (1945)). Proving these two elements does not establish negligence *per se,* however, as the trier of fact must then "evaluate whether the actions taken by the defendant were reasonable under all the circumstances." *Brooks,* 378 Md. at 79, 835 A.2d at 621; *see also Polakoff,* 385 Md. at 480–81, 869 A.2d at 845–46 (explaining the reasonableness inquiry in a case of alleged negligence under the Housing Code).

The Housing Code established the class of individuals who were required to follow the Code's provisions. According to the Code, any "owner or operator of a property subject to this Code shall be responsible for compliance with all of the provisions of the Code." [10] Balt. City Code, Art. 13, § 310(a). The Code defined an "owner" as "any person, firm, corporation ... who ... owns, holds, or controls the whole or any part of the freehold or leasehold title to any dwelling or dwelling unit, with or without accompanying actual possession

---

9. In *Brooks v. Lewin Realty,* 378 Md. 70, 80, 835 A.2d 616, 622 (2003), we rejected the requirement that knowledge of a violation of the Housing Code was "part of the tort plaintiff's burden of proof" when the plaintiff had "established that there was a statutory violation." We explicitly overruled a line of cases, beginning with *Richwind v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994), in which we had interpreted the Housing Code to require that owners or operators have notice of a Housing Code violation before they could be held liable for injuries that the violation caused. *Brooks,* 378 Md. at 72, 835 A.2d at 617.

10. The Housing Code defined an "operator" as "any person who has charge, care, or control of a building ... in which dwelling units ... are let or offered for occupancy" and included any person "managing or operating such building or part thereof." Balt. City Code (2000, 2002 Supp.), Art. 13, § 105(hh). We express no opinion on whether Respondent may have been an operator of the property because Petitioners have explicitly chosen not to advance that argument.

thereof...." Balt. City Code, Art. 13, § 105(jj). The Housing Code also set forth a variety of requirements that owners and operators were obligated to meet in regard to dwellings. The requirement at issue in the present case was set forth in § 702 of the Code, which stated that "every building ... used or occupied as a dwelling ... be kept in good repair, in safe condition, and fit for human habitation." Balt. City Code, Art. 13, § 702(a). One component of this "good repair and safe condition" requirement was that "[a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose, or peeling paint and paper." Balt. City Code, Art. 13, § 703(c)(3).

## "Owner" Under the Housing Code

Our first determination in this case is whether Respondent was an "owner" of the property as that term was defined in the Housing Code. Respondent argues that he could not have been an owner of the property because there is no evidence that he personally had the ability to purchase and sell the property or that he changed or affected the condition of the property. The trial court agreed that Respondent could not have been an owner of the property and granted summary judgment in his favor. The Court of Special Appeals affirmed that judgment. Upon a review of the Housing Code, relevant case law, and the facts of this case, we disagree. Instead, we conclude that Respondent's actions in regard to the property show that a reasonable trier of fact could find that he was an "owner" of the property, as the term "owner" was defined in the Housing Code, because there is evidence that he had the ability to change or affect the title to the property purchased in the name of Hard Assets.

We have not previously discussed the meaning of the term "owner" as it was defined in the Housing Code. In *Dyer v. Warren*, however, we discussed an almost identical use of that term in the Lead Poisoning Prevention Act ("Lead Paint Act"), Maryland Code (1982, 1996 Repl.Vol.), § 6–801(*o*) of the Environment Article. *Dyer v. Warren*, 371 Md. at 582–91, 810 A.2d at 942–47; *see also Dyer v. Criegler*, 142 Md.App. 109,

118, 788 A.2d 227, 233 (2002) ("In defining 'owner,' the Housing Code uses language nearly identical to that found in the Lead Paint Act."). The plaintiffs in that case filed a lead paint-related suit against Otis Warren Real Estate Co. ("Otis Warren"), a company "whose sole responsibility was to provide a tenant for the landlord" of the property. *Dyer v. Warren*, 371 Md. at 580, 810 A.2d at 941. The trial court dismissed the plaintiffs' claims, concluding that Otis Warren could not be held liable because Otis Warren was not an "owner" as defined by the Lead Paint Act, and the Court of Special Appeals affirmed that judgment. *Dyer v. Warren*, 371 Md. at 578, 810 A.2d at 940. We also affirmed the judgment, concluding that Otis Warren could not have been an owner of the property. *Dyer v. Warren*, 371 Md. at 578–79, 810 A.2d at 940. The Lead Paint Act, like the Housing Code, defines an "owner" as one who "owns, holds or controls" an interest in property. *Dyer v. Warren*, 371 Md. at 582, 810 A.2d at 940. Although Otis Warren had delivered possession of the property at issue to the plaintiffs, we held that this did not constitute "control" as that term is defined in the Lead Paint Act. *Dyer v. Warren*, 371 Md. at 589–91, 810 A.2d at 946–47.

Our decision in *Dyer v. Warren* is instructive for the present case because we discussed the term "owner" in a similar context. Both the Lead Paint Act and the Housing Code define "owner" as one who "alone or jointly or severally with others, owns, holds, or controls the whole or any part of the freehold or leasehold [interest/title] . . . with or without actual possession." [11] § 6–801(*o*) of the Environment Article;

---

[11] There are some minor differences between the definition of the term "owner" in the Housing Code and the Lead Poisoning Prevention Act ("Lead Paint Act"), Maryland Code (1982, 1996 Repl.Vol.), § 6–801(*o*) of the Environment Article. As the above text shows, the Housing Code referred to a "leasehold title," not a "leasehold interest." We do not, however, consider this relevant for purposes of this opinion.

The full definition of "owner" in the Lead Paint Act is:

(*o*) *Owner.—*

 (1) "Owner" means a person, firm, corporation, guardian, conservator, receiver, trustee, executor, or legal representative who, alone or jointly or severally with others, owns, holds, or controls the

Balt. City Code, Art. 13, § 105(jj). In determining whether Otis Warren was an owner of the property, we focused on, among other things, the meaning of the term "controls." [12] We did not attempt to define that term, but we concluded that Otis Warren had not controlled the rental property because it had not been "clothe[d] . . . with express authority to sell the property," because there were "no facts indicating that [Otis Warren] had the capability to comply with the [Lead Paint] Act's registration requirements," and because Otis Warren was complying with federal requirements when it delivered documents to tenants. *Dyer v. Warren*, 371 Md. at 590–91, 810 A.2d at 947.

The Court of Special Appeals' decision in *Dyer v. Criegler*, which was later renamed *Dyer v. Warren* when it was filed in this Court, provides additional clarity to the definition of both "owner" and "controls." The Court of Special Appeals explained that under the Lead Paint Act, "the term 'owner' has a

---

whole or any part of the freehold or leasehold interest to any property, with or without actual possession.

(2) "Owner" includes:

(i) Any vendee in possession of the property; and

(ii) Any authorized agent of the owner, including a property manager or leasing agent.

(3) "Owner" does not include:

(i) A trustee or a beneficiary under a deed of trust or a mortgagee; or

(ii) The owner of a reversionary interest under a ground rent lease. § 6–801(*o*) of the Environment Article.

In addition to using the term "interest" instead of "title," the Lead Paint Act also refers to "any property" instead of a "dwelling or dwelling unit." Balt. City Code, Art. 13, § 105(jj). The Housing Code also included language similar to, but different than, subsections (2) and (3) from the Lead Paint Act. § 6–801(*o*) of the Environment Article; Balt. City Code, Art. 13, § 105(jj)(2).

12. The plaintiffs in *Dyer v. Warren Real Estate*, 371 Md. 576, 584, 810 A.2d 938, 943 (2002), also argued that by explicitly including property managers and leasing agents in subsection (2)(ii) of the definition of "owner" in the Lead Paint Act, the Legislature intended for them to be considered owners even if they did not own, hold, or control the property at issue. Upon a review of the Lead Paint Act and the common law, we rejected that argument. *Dyer v. Warren*, 371 Md. at 584–87, 810 A.2d at 943–45.

broader meaning than when used in the traditional sense" because the Act provides an expanded definition of the term. *Dyer v. Criegler,* 142 Md.App. at 115, 788 A.2d at 231. The court concluded that while actual possession is not required for an entity to "control" property under the Lead Paint Act, "the phrase 'holds or controls' carries with it a requirement that the entity in question have an ability to change or affect the" interest being controlled. *Dyer v. Criegler,* 142 Md.App. at 117, 788 A.2d at 232.

█ To decide the present case, we similarly interpret the term "owner," albeit within the provisions of the Housing Code. That term included individuals who hold title to a dwelling. *See Pyles v. Goller,* 109 Md.App. 71, 84, 674 A.2d 35, 41 (1996) (defining "owner" as "the person in whom is vested ... the title of property") (quoting Black's Law Dictionary 1105 (6th Ed. 1990)). Like the Lead Paint Act, however, the Housing Code by its terms showed that the enacting body—in this case, the City Council—intended for the term "owner" to have a broader meaning than it does in the traditional sense. *See Dyer v. Criegler,* 142 Md.App. at 115, 788 A.2d at 231 (reaching the same conclusion regarding the definition of "owner" in the Lead Paint Act). The City Council provided a particular definition of the term, expanding its meaning not only to those who actually own the title to a dwelling, but also to those who "hold[ ] or control[ ]" that title as well. Balt. City Code, Art. 13, § 105(jj). The canons of statutory construction require that the additional words "hold[ ] or control[ ]" must provide some additional meaning to the term "owner" because, when possible, we read statutory language "so that no word, clause, sentence or phrase is rendered superfluous or nugatory." *Dyer v. Warren,* 371 Md. at 581, 810 A.2d at 941. Furthermore, the Code itself demonstrated that "owner" had a broader term than in the traditional sense, as the Code required that "[a]ny person deemed to be the owner *within the meaning of the definition of said term,* shall be bound to comply with the provisions of this Code to the same extent *as if he were the actual owner ....*" Balt. City Code, Art. 13, § 301(d) (emphasis added). We

therefore conclude that the City Council intended to expand the meaning of the term "owner" so that it referred not only to those who own the title to a dwelling, but also to a wider group of individuals who hold or control the title.

The parties agree that Respondent did not own or hold the title to the property, so we therefore determine whether he controlled the title to the property. We have never defined the term "control" as it was used in the Housing Code, but we agree with the Court of Special Appeals that it "carries with it a requirement that the entity in question have an ability to change or affect the" interest being controlled. *Dyer v. Criegler*, 142 Md.App. at 117, 788 A.2d at 232. This definition is consistent with the common definition of the term "control." Black's Law Dictionary 353 (8th Ed. 2004) (defining "control" as having the ability to "exercise power or influence over" property). The Housing Code's definition of the term "owner" states that one category of owner is an individual who "controls the ... title to any dwelling or dwelling unit," Balt. City Code, Art. 13, § 105(jj), so the relevant determination under the Code is whether Respondent had "an ability to change or affect the" title to the property at issue in this case.

We recognize a number of ways in which a reasonable trier of fact could determine that Respondent had the "ability to change or affect" the title to the property. Respondent stated in his deposition that he was responsible for running the day-to-day affairs of Hard Assets during the time period when Hard Assets both acquired and sold 3143 Elmora Avenue. Respondent also executed the deed certification when Hard Assets acquired the property, signed the complaint seeking to remove Petitioners from the property, and signed the deed when Hard Assets sold the property. These facts are sufficient evidence for a jury to find that Respondent may have changed or affected the title. For example, the trier of fact could find that Respondent directed the acquisition of the property, the legal action that led to the ejection of Petitioners from the property, or the sale of the property. *See Dyer v. Warren*, 371 Md. at 591, 810 A.2d at 947 (noting that Otis Warren was not an owner because it lacked "express authority

to sell the property"). Furthermore, even if Respondent did not actually direct these actions, the trier of fact could find that he had the "ability" to do so. This would have also been sufficient to establish that he controlled the title to the property. Finally, there is no evidence that anyone other than Respondent was responsible for the day-to-day management of Hard Assets or for decisions affecting the title to the property, which supports the conclusion that Respondent was the person who made decisions affecting the title to the property.[13]

---

13. We acknowledge that this conclusion is inconsistent with the Court of Special Appeals' opinion in *Shipley v. Perlberg*, 140 Md.App. 257, 780 A.2d 396 (2001), upon which the trial court based its judgment. The plaintiff in that case also asserted claims under the Housing Code for alleged lead paint injuries, and the intermediate appellate court concluded that Perlberg, the defendant and a corporate officer, could not be held liable for the corporation's alleged torts. *Shipley*, 140 Md.App. at 276, 780 A.2d at 406. The court concluded that Perlberg was not an "owner" because the evidence was "undisputed that [the corporation] owned the subject property during the relevant time period" and that there was "no evidence that Perlberg had title to the subject property." *Shipley*, 140 Md.App. at 277, 780 A.2d at 408. Based on these facts, the court concluded that there was "no evidence that Perlberg ... exercised ownership in the manner contemplated by the Code." *Shipley*, 140 Md.App. at 277, 780 A.2d at 407.

We disagree with the Court of Special Appeals' reasoning in *Shipley*. The court concluded that Perlberg was not an "owner" under the Housing Code because he did not have title to the property at issue in that case. *Shipley*, 140 Md.App. at 277, 780 A.2d at 408. The court reached this conclusion even though there was evidence that Perlberg was involved with the buying and selling of that property. *Shipley*, 140 Md.App. at 262, 780 A.2d at 398. As we have explained in this opinion, the Housing Code expanded the meaning of the term "owner" to include not only entities that hold the title to dwellings, but also entities that control the title to those dwellings. *See* Balt. City Code, Art. 13, § 105(jj) (defining "owner"); *Dyer v. Criegler*, 142 Md.App. 109, 115, 788 A.2d 227, 231 (2002) (discussing the expanded meaning of the term "owner" under a similar definition). The ability to buy and sell the property where an alleged injury occurred is an example of controlling the title to a dwelling.

Nonetheless, we agree with the Court of Special Appeals' ultimate conclusion in *Shipley*, which was that Perlberg could not be held personally liable for violations of the Housing Code. *Shipley*, 140 Md.App. at 280, 780 A.2d at 407. There was no evidence in that case that Perlberg was involved with the part of the corporation that dealt with the management of any properties. *Shipley*, 140 Md.App. at 278,

Respondent contends that he was not an owner of the property in part because he never visited the property and never intended to lease the property to anyone. We find these alleged facts irrelevant to whether Respondent was an "owner" of the property, as the Housing Code defined that term. Should the case ultimately reach the trier of fact, the trier of fact will determine whether Respondent acted reasonably under the circumstances of the case. *See Brooks,* 378 Md. at 86, 835 A.2d at 625 (explaining that "it will be the duty of the trier of fact to determine whether the steps taken . . . to ensure compliance with the Code . . . were reasonable under all the circumstances"). In making this reasonableness determination, the trier of fact may consider a number of facts that the parties have alleged. For example, the trier of fact may consider that the previous owner of the property apparently told Respondent that no one lived at the property, that Respondent never intended to rent the property to anyone, that Petitioners were living at the property without any legal right to possession, and that Respondent took action to remove Petitioners from the property when he learned they lived there. The trier of fact may also consider that Respondent never inspected the property before he purchased it, that he did not inspect the property immediately after he purchased it, and that he apparently took no action to maintain the property. Each of these alleged facts, and any others developed at trial, may influence the trier of fact when it determines whether Respondent's actions were reasonable.

This Court is not in a position, however, to determine whether Respondent's actions were reasonable. Before us is

780 A.2d at 408. To the contrary, uncontradicted evidence indicated that another corporate officer was responsible for managing properties and that Perlberg "had no direct involvement in the subject premises, of any type." *Shipley,* 140 Md.App. at 262, 780 A.2d at 398. Accordingly, Perlberg may have been an "owner" under the Housing Code, but he could not have been held personally liable for the alleged violations of the Code. As we discuss in this opinion, *infra,* a corporate officer is not liable for torts committed by the corporation unless he personally committed, inspired, or participated in those torts. *See Tedrow,* 265 Md. at 550–51, 290 A.2d at 802–03 (explaining personal liability for torts committed on behalf of a corporation).

whether the trial court properly granted Respondent's motion for summary judgment when the trial court concluded that, as a matter of law, Respondent was not an "owner" of the property. We conclude that the trial court's conclusion was incorrect. Based on the record presented in this case, this issue cannot be decided as a matter of law. The trier of fact could find that Respondent controlled the title to the property, which would have made him an "owner" within the meaning of the Housing Code.

## LLC Membership

■ Regardless of his status as an "owner" under the Housing Code, Respondent contends that he cannot be held liable in this case because his only involvement with the property was through Hard Assets, the entity that owned the property. We disagree that this necessarily shields him from liability under the facts of this case. To the contrary, we conclude that a reasonable trier of fact could determine that Respondent personally committed, inspired, or participated in the tort alleged in this case, even as a member of Hard Assets.[14] If so, he may be held personally liable for Petitioners' injuries.

■ A member of an LLC generally is not liable for torts committed by, or contractual obligations acquired by, the LLC. *See* Md.Code (1975, 2007 Repl.Vol.), § 4A–301 of the Corporations & Associations Article (limiting liability of LLC members); *Tedrow v. Deskin,* 265 Md. 546, 550–51, 290 A.2d 799, 802–03 (1972) (explaining that if a corporate officer "takes no part in the commission of the tort committed by the corporation, he is not personally liable therefor unless he specifically directed the particular act to be done, or partici-

---

14. As explained *supra* note 2, a member of an LLC is "a person with an interest in a limited liability company with the rights and obligations specified under" Title 4A of the Corporations and Associations Article. § 4A–101(n) of the Corporations & Associations Article. The record does not show what particular interest Respondent had in Hard Assets, but he concedes that during the relevant time period he was a member of Hard Assets and that he managed its day-to-day affairs.

pated or cooperated therein"). An individual may be liable, however, "for torts [he or she] personally commit[s], or which [he or she] inspire[s] or participate[s] in, even though performed in the name of an artificial body." *Metromedia v. WCBM Maryland,* 327 Md. 514, 519–22, 610 A.2d 791, 794–95 (1992) (quoting *Tedrow,* 265 Md. at 550, 290 A.2d at 802–03). An individual may also be liable despite limitations on his or her liability when he or she "is present on a daily basis during commission of the tort and gives direct orders that cause commission of the tort." *MaryCLE v. First Choice,* 166 Md.App. 481, 528, 890 A.2d 818, 845 (2006) (quoting *T–Up v. Consumer Protection,* 145 Md.App. 27, 72, 801 A.2d 173, 199, *cert. denied,* 369 Md. 661, 802 A.2d 439 (2002)).

■ These cases discuss tort liability for corporate officers and agents who personally committed, inspired, or participated in torts in the name of a corporation. We have not previously determined whether these same principles apply to members of LLCs. We agree, however, with other jurisdictions that have come to that conclusion. *See, e.g., Weber v. U.S. Sterling Sec., Inc.,* 282 Conn. 722, 924 A.2d 816, 824 (2007) (explaining that, under a substantially similar LLC statute, an LLC is "treated for liability purposes like a corporation"); *Luna v. A.E. Eng'g Servs., LLC,* 938 A.2d 744, 748 (D.C.2007) (applying to an LLC member the "general rule . . . that corporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation"); *Milk v. Total Pay & HR Solutions, Inc.,* 280 Ga.App. 449, 634 S.E.2d 208, 213 (2006) (explaining that, under a substantially similar LLC statute, an "LLC member may be held individually liable if he or she personally participates or cooperates in a tort committed by the LLC or directs it to be done"); *Estate of Countryman v. Farmers Coop. Ass'n,* 679 N.W.2d 598, 602–03 (Iowa 2004) (explaining that "the members and managers [of an LLC] are protected from liability in the same manner shareholders, officers, and directors of a corporation are protected"); *Ditty v. CheckRite, Ltd., Inc.,* 973 F.Supp. 1320, 1335 (D.Utah 1997) ("While there is little case law discussing veil

piercing theories outside the corporate context, most commentators assume that the doctrine applies to limited liability companies."). This conclusion is also consistent with the text of the Corporations and Associations Article, which states that a member of an LLC will not be liable "*solely* by reason of being a member of the [LLC]." § 4A-301 of the Corporations & Associations Article (emphasis added). An LLC member is liable for torts he or she personally commits, inspires, or participates in because he or she personally committed a wrong, not "solely" because he or she is a member of the LLC. *See Weber*, 924 A.2d at 824–25 (adopting this interpretation of the phrase "solely by reason of being a member of the [LLC]").[15]

Section 310(b) of the Housing Code further supports our conclusion that an LLC member may be held liable as an "owner" under the Code. Our primary responsibility in statutory interpretation is to carry out the intent of the enacting body. *Dyer v. Warren*, 371 Md. at 580–81, 810 A.2d at 941. Section 310(b) of the Housing Code stated that "[w]henever a corporation shall violate any of the provisions of this Code, such violation shall be deemed to be also that of the individual directors, officers, or agents of such corporation who shall have authorized, ordered, or done any of the acts . . . or who shall knowingly have acquiesced in any failure to act. . . ." Balt. City Code, Art. 13, § 310(b). Section 310(b) does not expressly impose liability on LLC members when the LLC violates the Code because, by its terms, § 310(b) only applied

---

**15.** We reject the Amici's argument that holding an LLC member personally liable as an "owner" under the Housing Code is impermissibly inconsistent with the Corporations and Associations Article. The Amici argue that individual LLC members cannot be held liable under the Housing Code because the Corporations and Associations Article grants LLC members limited liability. Under the Corporations and Associations Article and the common law, as we have explained, LLC members are liable for torts when they commit, inspire, or participate in them. Accordingly, an LLC member can be held liable as an "owner" under the Housing Code if he or she committed, inspired, or participated in a violation of the Code, notwithstanding his or her limited liability under the Corporations and Associations Article.

to corporations.[16] Balt. City Code, Art. 13, § 310(b). Section 310(b) does evince, however, the City Council's intent to hold individuals responsible for their participation in violations of the Housing Code, even when the individual violated the Code through an artificial body. Our conclusion that LLC members may be liable for violations of the Code as "owners" is consistent with that intent.[17]

Turning to the facts of the present case, we conclude that the trier of fact could find that Respondent is personally liable for Petitioners' alleged injuries. As we have discussed, Respondent managed Hard Assets' day-to-day affairs during the period that Hard Assets owned the property, and there is no evidence that anyone else managed those affairs during that period. These facts are sufficient evidence for the trier of fact to find that Respondent personally committed, inspired, or participated in Hard Assets' decisions regarding maintenance of the property. For example, Respondent may have personally directed someone else to inspect or maintain the property, or Respondent may have directed someone else not to inspect or maintain the property. Respondent also may have chosen not to direct anyone to inspect or maintain the property. Negligent maintenance of the property is the basis for the tort that Petitioners have alleged. Accordingly, the trier of fact could conclude that Respondent committed, inspired, or partic-

---

16. The omission of LLCs from § 310(b) cannot be attributed to the City Council's intent to exclude LLC members from personal liability. LLCs were not a recognized business form in Maryland until 1992. *See* § 4A–301 of the Corporations & Associations Article (enacted in 1992). This was 11 years after the City Council enacted § 310(b). *See* Balt. City Code (1976, Supp. 1981), Art. 13, § 310(b) (containing § 310(b) as originally enacted and identical to § 310(b) during the relevant time period).

17. The Amici contend that LLC members cannot be held liable as "owners" under § 310(a) of the Housing Code because this would render superfluous § 310(b) of the Code. We disagree. Section 310(b), by its explicit terms, applied only to corporations, not LLCs. Balt. City Code, Art. 13, § 310(b). We have interpreted § 310(a) to support liability for torts that LLC members personally commit, which is entirely separate from the liability that § 310(a) imposed on corporate directors, officers, and agents.

ipated in the tort in this case and was therefore personally liable.

## Duty to Petitioners

 Finally, Respondent asserts that he cannot be held liable for Petitioners' alleged injuries because he owed them no duty. He presents two arguments in support of this assertion. First, Respondent argues that the Housing Code imposed no duty on owners of property in regard to individuals who have no legal right to possess the property. Because a court determined that Petitioners were wrongfully in possession of the property, Respondent asserts that he owed no duty to them. Second, Respondent contends that the Housing Code did not impose a duty on owners of property unless they leased, or at least intended to lease, that property. According to the undisputed facts, neither Respondent nor Hard Assets intended to lease the property in question; thus, Respondent asserts that he owed no duty to Petitioners under the Housing Code. We disagree that these facts would preclude Respondent's liability under the Housing Code for Petitioners' alleged injuries.

 As we explained above, a plaintiff must prove only two things to establish a *prima facie* case of negligence under the Housing Code: "(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks*, 378 Md. at 79, 835 A.2d at 621; *Polakoff*, 385 Md. at 476, 869 A.2d at 843. Once a plaintiff has established these two requirements, the trier of fact must determine whether the defendant acted reasonably under the circumstances of the case. *Brooks*, 378 Md. at 79, 835 A.2d at 621. A review of the Housing Code shows the class of persons that the Housing Code was intended to protect. The Housing Code specifically stated that it was intended to "establish and maintain basic minimum requirements, standards, and conditions essential for the protection of the health, safety, morals, and general welfare of the public and ... *occupants of dwellings* in the City of Baltimore." Balt. City Code, Art. 13, § 103(a) (emphasis added). The Code defined an "occupant"

as "the person who actually uses or has possession of the premises." Balt. City Code, Art. 13, § 105(gg). This language shows the City Council's intention to protect occupants of dwellings. The Housing Code further instructed courts to construe its requirements liberally to effectuate this purpose. Balt. City Code, Art. 13, § 103(b).

Despite the sweeping language of the Housing Code, Respondent asserts that the Code was not intended to protect individuals who have no legal right to possess a dwelling. He has cited a number of cases for this argument. *See Wells v. Polland,* 120 Md.App. 699, 709–10, 708 A.2d 34, 39–40 (1998) (discussing the duty owed by an owner or occupant of land); *Tennant v. Shoppers Food,* 115 Md.App. 381, 387–88, 693 A.2d 370, 374 (1997) (same); *Flood v. Attsgood Realty,* 92 Md.App. 520, 524, 608 A.2d 1297, 1299 (1992) (same). Respondent's reliance is misplaced. These cases concern the common law rule that a landowner owes a limited duty to those who trespass on his or her property. That rule, however, is inapplicable to the present case because the duty here is based on the Housing Code, not the common law. *See Brooks,* 378 Md. at 78, 835 A.2d at 620 (explaining that in negligence actions based on statutory violations, "the defendant's duty ordinarily 'is prescribed by the statute' or ordinance" (quoting *Brown,* 357 Md. at 358, 744 A.2d at 55)). We have explained in recent opinions that "[e]vidence of negligence may be established by the breach of a statutory duty 'when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent.' " *Pendleton v. State,* 398 Md. 447, 466, 921 A.2d 196, 208 (2007) (quoting *Remsburg v. Montgomery,* 376 Md. 568, 584, 831 A.2d 18, 27 (2003)).

Petitioners are within the class of persons that the Housing Code was intended to protect, and they have alleged injuries that the statute was designed to prevent. The express purposes of the Housing Code demonstrated that the City Council intended to protect the occupants of dwellings. Balt. City Code, Art. 13, § 103(a) (explaining that the Housing Code was intended to protect "occupants of dwellings"); *see also* Balt.

City Code, Art. 13, § 105(gg) (defining "occupant"). Petitioners are within that protected class of persons.[18] Furthermore, as we noted in *Brown*, the Housing Code was intended "to protect children from lead paint poisoning. . . ." 357 Md. at 367, 744 A.2d at 60. Petitioners' claims are all based on harm to children that was allegedly caused by lead paint poisoning. Accordingly, we conclude that Respondent owed a duty to Petitioners regardless of whether Petitioners had a legal right to possess the property.[19]

Similarly, Respondent argues that the Housing Code imposed no duty on those who owned dwellings but did not intend to lease them.[20] We see nothing in the Housing Code that supports this argument. To the contrary, the Code

---

**18.** The Supreme Court of North Carolina reached a similar conclusion in *Bell v. Page*, 271 N.C. 396, 156 S.E.2d 711 (1967). In *Bell*, the defendant failed to erect a fence around his swimming pool in violation of a municipal ordinance. 156 S.E.2d at 714. A child, who was trespassing on the defendant's property, drowned in the pool. *Bell*, 156 S.E.2d at 714. The court recognized that the defendant would have owed a limited duty to the child under the common law. *Bell*, 156 S.E.2d at 714–15. Regardless, the court held that the defendant should be held to the higher duty established by the ordinance because the ordinance's "primary purpose and intent . . . was to provide protection for children without reference to whether they were legally entitled to use the pool." *Bell*, 156 S.E.2d at 715.

**19.** The record does not provide the basis upon which Petitioners claimed a right to possess the property before or after Hard Assets purchased the property. Nonetheless, counsel for Petitioners contended during arguments before this Court that Petitioners were tenants holding over because they had previously possessed the property pursuant to a lease. We need not determine, however, if this contention was correct because it would make no difference to our decision. We have concluded that, under the Housing Code, the owner of a dwelling owed a duty to all occupants of that dwelling, regardless of whether the occupants had a legal right to possess the dwelling.

**20.** Respondent specifically argues that he "was not a landlord to [Petitioners] and had no legal obligation to them." We acknowledge that we have often stated that the Housing Code imposed duties on landlords who rented property. *Polakoff v. Turner*, 385 Md. 467, 477, 869 A.2d 837, 843 (2005); *Brooks*, 378 Md. at 81, 835 A.2d at 622; *Brown v. Dermer*, 357 Md. 344, 359, 744 A.2d 47, 55 (2000). We have never said, however, that the Housing Code only imposed duties on landlords who rented property. The Housing Code would not have

explicitly stated in no uncertain terms that it was intended to fix duties on "owners, operators, agents, and occupants of dwellings." Balt. City Code, Art. 13, § 103(a). As we have discussed extensively in this opinion, it also stated that "*[a]ny person who is either an owner or operator of a property subject to this Code shall be responsible for compliance with all of the provisions of the Code.*" Balt. City Code, Art. 13, § 310(a) (emphasis added). The Code further stated that "[a]n owner shall be held liable for all violations of this Code in connection with any land, buildings, structure, or matter or thing owned or operated by him...." Balt. City Code, Art. 13, § 310(a).[21] We therefore conclude that the duties that the Housing Code imposed on owners of dwellings applied even if the owners did not intend to lease their dwellings.[22]

## III.

### Conclusion

The Housing Code was enacted to protect the safety and well-being of occupants of dwellings. This intent was effectu-

---

supported such a statement, as the Code did not use the term "landlord" or restrict its application to entities that rent property. The dispositive factor in the present case is that a reasonable trier of fact could find that Petitioners occupied the property, that Respondent "owned" the property as that term was defined by the Housing Code, and that Respondent participated in the tort alleged in this case.

21. The Code demonstrated that the City Council could have limited the duties of owners. For example, the Code provided an express limitation on the responsibilities of owners, stating that owners and operators were not required to comply with the duties imposed on occupants unless the owners or operators actually occupied the property. *See* Balt. City Code, Art. 13, § 310(a) (limiting owners and operators' responsibilities as occupants if the owner or operator was not an occupant). The City Council could have similarly stated that owners were only required to comply with the Code if they intended to lease their dwellings, but the City Council did not do so.

22. This interpretation of the Housing Code imposes a far-reaching duty, but this duty was consistent with and supported the explicit intent of the City Council. This duty ensured that owners and operators of dwellings would be as diligent as possible in ensuring the safety of those who occupied dwellings and, ultimately, the safety of the public at large.

ated by imposing upon owners and operators of dwellings a duty to keep those dwellings in a safe condition. Respondent did not personally hold the title to the property at issue in this case, but a reasonable trier of fact could find that he controlled it within the meaning of the Housing Code. A reasonable trier of fact could also find that he personally participated in the tort alleged in this case. Accordingly, he may be held personally liable for the injuries that were allegedly caused by his failure to keep the property in a safe condition. Whether Respondent owned the property under the Housing Code, whether he participated in the alleged tort, whether his actions proximately caused Petitioners' alleged injuries, and, ultimately, whether he acted reasonably under the circumstances, are all matters of disputed fact. The trial court therefore erred when it granted summary judgment on behalf of Respondent.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THAT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.*

HARRELL, J., dissents and files opinion, in which ADKINS, J., joins.

Dissenting Opinion by HARRELL, Judge, which ADKINS, J., joins.

I dissent respectfully from the conclusion reached in the Majority Opinion, namely, that Respondent, Jay Dackman, may be held liable personally to Petitioners as "owner" of the property involved in the present case. Although I agree with the Majority Opinion that the correct determination as to whether Respondent qualifies as an "owner" under § 310(a) of the Baltimore City Housing Code depends necessarily upon whether Respondent had "an ability to change or affect" the title to the property, I maintain that, because Respondent did

not have, *in his individual capacity,* "an ability to change or affect" the title to the property, he was not an "owner" of the property. As such, I would affirm the judgment of the Court of Special Appeals.

In reaching its conclusion that Respondent may be held liable personally to Petitioners as an "owner" of the subject property, the Majority Opinion states:

> The parties agree that Respondent did not own or hold the title to the property, so we therefore determine whether he controlled the title to the property. We have never defined the term "control" as it was used in the Housing Code, but we agree with the Court of Special Appeals that it "carries with it a requirement that the entity in question have an ability to change or affect the" interest being controlled. *Dyer v. Criegler,* 142 Md.App. at 117, 788 A.2d at 232. This definition is consistent with the common definition of the term "control." Black's Law Dictionary 353 (8th Ed. 2004) (defining "control" as having the ability to "exercise power or influence over" property). The Housing Code's definition of the term "owner" states that one category of owner is an individual who "controls the ... title to any dwelling or dwelling unit," Balt. City Code, Art. 13, § 105(jj), so the relevant determination under the Code is whether Respondent had "an ability to change or affect the" title to the property at issue in this case.

> We recognize a number of ways in which a reasonable trier of fact could determine that Respondent had the "ability to change or affect" the title to the property. Respondent stated in his deposition that he was responsible for running the day-to-day affairs of Hard Assets during the time period when Hard Assets both acquired and sold 3143 Elmora Avenue. Respondent also executed the deed certification when Hard Assets acquired the property, signed the complaint seeking to remove Petitioners from the property, and signed the deed when Hard Assets sold the property. These facts are sufficient evidence for a jury to find that Respondent may have changed or affected the title.

*Allen v. Dackman,* No. 46, Sept. Term 2009, op. at 149, 991 A.2d at 1226. The Majority Opinion, however, ignores the fact that any ability possessed by Respondent to "change or affect" the title to the property came *solely by virtue of his position as a member of Hard Assets, LLC.* Similarly, any actions undertaken by Respondent regarding the title to the subject property were undertaken *solely in his capacity as a member of Hard Assets.* Despite the Majority Opinion's reasoning to the contrary, Respondent possessed no ability to "change or affect" the title to the property *in his individual capacity.*

It is undisputed that Hard Assets, LLC, acquired, held, and sold the title to the subject property. In doing so, although Hard Assets acted, of necessity, through one of its individual members, namely, Respondent, Hard Assets nevertheless was the entity that maintained the "ability to change or affect" the title to the property. *See Bob Holding Corp. v. Normal Realty Corp.,* 223 Md. 260, 266, 164 A.2d 457, 460 (1960) (noting that a corporation is able to act only through individuals). On the other hand, there is no suggestion in the record that Respondent, in his individual capacity, possessed the legal "ability to change or affect" the title to the property. The actions undertaken by Respondent on behalf of Hard Assets, such as executing the deed certification when Hard Assets acquired the property or signing the deed when Hard Assets sold it, cannot form the basis for the conclusion that Respondent, *in his individual capacity,* possessed the "ability to change or affect" the title to the property. As such, Hard Assets, LLC, and not Respondent, was the sole party with the "ability to change or affect" the title to the property, the sole party with "control" over the title to the property, and, thus, the sole "owner" of the property. Therefore, Respondent may not be held liable personally to Petitioners because he does not qualify, in his individual capacity, as an "owner" within the meaning of § 310(a) of the Baltimore City Housing Code. As such, I would affirm the judgment of the Court of Special Appeals.

Judge ADKINS authorizes me to state that she joins in this dissenting opinion.