*Hector, et al. v. Bank of New York Mellon*, No. 3100, September Term 2018.  Opinion by Beachley, J.

**TRUSTEE—REPRESENTATIVE CAPACITY SEPARATE FROM INDIVIDUAL CAPACITY**

**TRUSTEE LIABILITY—PERSONAL LIABILITY—PERSONALLY AT FAULT**

While they were young children, appellants lived from 2001 to 2002 at a property which allegedly contained lead paint.  Appellants supposedly consumed lead paint at the property and contracted lead poisoning, causing them serious permanent injuries.

At the time that appellants lived at the property and were allegedly exposed to lead paint, Bank of New York Mellon ("BNYM") served as the trustee of the Trust that owned the property (and numerous other properties and loans).  The Trust was created when BNYM and other parties executed a Pooling and Servicing Agreement ("PSA") which defined the roles and responsibilities of each of the parties to the Trust.

In April 2016, appellants filed an amended complaint against Bank of New York Mellon ("BNYM"), alleging BNYM's negligence as the "owner" of the property pursuant to the Baltimore City Housing Code.  BNYM moved for summary judgment, arguing that appellants had conflated BNYM in its individual capacity with BNYM in its trustee capacity.  BNYM also argued that it was not an "owner" under the Housing Code and was therefore not personally liable to appellants for any injuries they sustained.

The circuit court granted BNYM's motion for summary judgment on the basis that appellants had sued the wrong party, i.e., that appellants should have pursued their claim against BNYM as Trustee, not BNYM individually.  The court then granted appellants' request for leave to amend their amended complaint.  Appellants amended their complaint, and BNYM moved to strike or dismiss the amended complaint.  The court granted BNYM's motion, essentially affirming the prior ruling that appellants had sued the wrong party.  Appellants timely appealed.

*Held*: Judgment affirmed.  There is a distinction between a party in its capacity as a trustee and that same party in its individual capacity.  Although the Maryland Trust Act [Md. Code (1974, 2017 Repl. Vol.), § 14.5-908 of the Estates and Trusts Article] recognizes that a trustee may be held personally liable in tort, it does not address the circumstances that may give rise to such personal liability.  The Restatement (Third) of Trusts, however, provides that a trustee may be held personally liable for claims sounding in tort "only if the trustee is personally at fault."  To be "personally at fault," the trustee must have personally committed, inspired, or participated in the alleged torts in accordance with *Allen v. Dackman*, 413 Md. 132, 155 (2010).

Even assuming BNYM as Trustee were an "owner" of the property pursuant to the Baltimore City Housing Code, appellants failed to produce any facts tending to show that BNYM was personally at fault by personally committing or participating in negligence related to the lead paint. Contrarily, BNYM produced evidence showing that, pursuant to the PSA, its role as trustee was passive, and that it was "not empowered to manage or improve" the property. Instead, BNYM as Trustee was simply responsible for "safekeeping of cash and collateral, distribution of cash flows from the collateral, and relaying trust asset and performance information received from the servicer to the certificateholders."

Because appellants failed to produce any facts showing that BNYM as Trustee was personally at fault, they could not maintain their action against BNYM for personal liability. Accordingly, the court correctly granted summary judgment in favor of BNYM

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3100

September Term, 2018

_____

ASHLEY HECTOR, ET AL.

v.

BANK OF NEW YORK MELLON

_____

Berger,
Beachley,
Wells,

JJ.

_____

Opinion by Beachley, J.

_____

Filed:  January 29, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On June 10, 2016, Ashley and Alyaa Hector ("appellants"), as minors, filed an amended complaint in the Circuit Court for Baltimore City alleging negligence for injuries related to lead paint exposure. The amended complaint charged three separate defendants with negligence: Sharlene Epps-Smith, Daniel Smith, and the Bank of New York Mellon ("BNYM"). BNYM filed an answer and, at the close of discovery, moved for summary judgment as to its respective negligence count. Following a hearing, the circuit court granted BNYM's motion, but granted appellants leave to amend their complaint.

On July 24, 2018, appellants filed their second amended complaint. BNYM moved to strike or dismiss this complaint and, following a hearing on October 3, 2018, the circuit court granted BNYM's motion, effectively affirming the initial grant of summary judgment. Appellants timely appealed[1] and present one question for our review, which we rephrase as follows:

> Did the trial court err in granting summary judgment by finding that BNYM was not liable in its individual capacity to appellants?[2]

Because we conclude that appellants produced insufficient evidence that BNYM as

---

[1] After the circuit court granted BNYM's motion to strike or dismiss the second amended complaint, appellants stipulated to the dismissal of Sharlene Epps-Smith and Daniel Smith as defendants. This appeal only concerns whether the circuit court erred in dismissing BNYM as a defendant.

[2] Appellants presented the following question in their brief:

Did the trial court err in granting summary judgment by finding as a matter of law, that the BNYM, as Trustee for a mortgage backed-security and holder of the Deed of Trust, had no individual duty to minor children residing in an old[,] dangerous rental property in Baltimore City, where BNYM defaulted the debtor, foreclosed on the property, and purchased the dwelling at auction?

Trustee was personally at fault for any negligence related to the property, we affirm the circuit court's grant of summary judgment in favor of BNYM in its individual capacity.

## FACTS AND PROCEEDINGS

This case concerns property located at 447 North Linwood Avenue, located in Baltimore City (the "Property"). In order to address the issue on appeal, we must explain both BNYM's and appellants' connections to the Property. We begin with BNYM.

In September 1999, Intercoastal Investment Trust, Ltd. purchased the Property and then entered into a ninety-nine-year lease with defendant Sharlene Epps-Smith pursuant to a purchase money deed of trust secured by the Property. This security, along with hundreds of other loans, was contemporaneously pooled into a trust (the "Trust"). The Trust was created when BNYM as Trustee and several other parties not related to this appeal executed a Pooling and Servicing Agreement ("PSA") which established the rights and responsibilities of the various parties that were to manage and control the Trust. The PSA specifically outlined the scope of the Trustee's duties, as well as its liabilities to the Trust. That BNYM functioned only as a trustee in regard to the Trust will be significant in our analysis.

In November 2001, Sharlene Epps-Smith defaulted on the loan, and the Trust appointed substitute trustees to initiate foreclosure proceedings on the Property. On December 27, 2001, BNYM as Trustee purchased the Property at the foreclosure sale, and on March 11, 2002, BNYM as Trustee moved for possession of the property. The circuit court granted BNYM as Trustee's motion for possession on August 15, 2002.

2

From 2001 to 2002, appellants' father was a tenant at the Property, and appellants lived in or visited the Property during this time. According to appellants, the walls, floors, doors, ceilings, and woodwork of the Property contained lead pigments which are dangerous to children. Appellants apparently consumed the lead paint and powder and subsequently contracted lead poisoning, causing them serious permanent injuries.

Appellants lodged their first complaint against Sharlene Epps-Smith and Daniel Smith[3] on April 27, 2016. They amended their complaint on June 10, 2016, to include BNYM, in its individual capacity, as a third defendant. In the count alleging BNYM's negligence, the amended complaint stated,

> For that all [sic] of the time mentioned herein the Defendant, [BNYM], owned and/or controlled, either individually or by the use of agents, apparent agents, servants and/or employees, a lot of ground and building known as [the Property] . . . which [BNYM] either individually or by agents, apparent agents, servants or employees, had a duty to manage, supervise, and maintain pursuant to the Baltimore City Code. [BNYM], as trustee under a Pooling and Servicing Agreement, pursuant to a foreclosure, did purchase [the Property] at auction on December 27, 2001.

Thus, appellants' theory of liability against BNYM individually was that BNYM, either individually or through its agents or employees, "had a duty to manage, supervise, and maintain [the Property] pursuant to the Baltimore City [Housing] Code." Notably, appellants never amended their complaint to sue BNYM as Trustee.

In its answer, BNYM stated that the amended complaint incorrectly conflated it with BNYM as Trustee for the Trust, generally denied any liability, and noted that it "ha[d] no

---

[3] According to BNYM's motion for summary judgment, Sharlene Epps-Smith owned the property and Daniel worked as her property manager.

3

personal liability for [appellants'] claims." BNYM then moved for summary judgment. The circuit court held a hearing on July 11, 2018. At the hearing, BNYM reiterated that appellants were suing the wrong party because BNYM was only involved with the Property in a trustee capacity. BNYM also argued that, because it was not an "owner" pursuant to the Baltimore City Housing Code or the Maryland Lead Paint Act, it could not be liable for injuries sustained at the Property. The circuit court granted BNYM's motion from the bench, concluding that "[BNYM] is not the trustee, that [BNYM] as presented by Counsel for [appellants] is not the appropriate party to be sued[.]" Appellants requested leave to amend their amended complaint, and, over objection, the circuit court granted that request.

Nearly two weeks later, on July 24, 2018, appellants filed their second amended complaint. BNYM moved to strike or dismiss, and the parties appeared for a hearing on October 3, 2018. At the hearing, BNYM characterized the issue for the court's review as follows: "whether or not the second amended complaint, which has named [BNYM] in its individually [sic] capacity can stand." The circuit court concluded that the judge who presided over the motion for summary judgment had already "granted summary judgment on behalf of defendant [BNYM] in [its] individual capacity." In granting BNYM's motion, the court stated that it saw "no reason to reconsider or to interfere with [that] order[,]" and appellants timely appealed. We shall provide additional facts as necessary.

## STANDARD OF REVIEW

The circuit court granted BNYM's motion for summary judgment, finding that BNYM was "not the appropriate party to be sued," because BNYM, in its individual capacity, was not involved with the Trust. "Ordinarily, an appellate court will not affirm

4

a summary judgment by ruling on a ground not ruled upon by the trial court. If the alternative ground is one as to which the trial court had no discretion, however, summary judgment may be affirmed." *Thomas v. City of Annapolis*, 113 Md. App. 440, 450 (1997) (citing *Md. Cas. Co. v. Lorkovic*, 100 Md. App. 333, 357 (1994)). "With respect to the trial court's grant of a motion for summary judgment, the standard of review is *de novo*." *Dashiell v. Meeks*, 396 Md. 149, 163 (2006) (citing *Rockwood Cas. Ins. Co. v. Uninsured Emp'rs' Fund*, 385 Md. 99, 106 (2005)). Before determining whether the circuit court's decision was legally correct, however, appellate courts must first determine whether there is any genuine dispute of material facts. *Id.* (citing *Converge Servs. Grp., LLC v. Curran*, 383 Md. 462, 476 (2004)). All factual disputes must be resolved in favor of the non-moving party. *Id.* (citing *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 114 (2004)). When the moving party has provided the court with sufficient grounds to grant summary judgment, the opposing party must demonstrate that there is a genuine dispute of material fact. *Reiter v. ACandS, Inc.*, 179 Md. App. 645, 659-60 (2008) (quoting *Miller v. Ratner*, 114 Md. App. 18, 27 (1997)).

## DISCUSSION

The issue in this case is whether appellants may sue BNYM in its individual capacity where BNYM's only connection to the Property stems from its role as trustee of the Trust that owned the mortgage to the Property. In their brief, appellants argue that the Maryland Uniform Trust Act, Md. Code (1974, 2017 Repl. Vol.), § 14.5-908 of the Estates and Trusts Article ("ET") does not limit the liability of the trustee, and "implies that a trustee may be held liable in its individual capacity." BNYM responds that "[a] trustee and an individual

5

entity are two wholly distinct and separate persons under the law[,]" and that BNYM never had any relationship with the Property beyond its capacity as trustee of the Trust. As we shall explain, appellants have failed to provide facts demonstrating that BNYM as Trustee was "personally at fault" for their injuries in accordance with the standard for trustee liability as set forth in the Restatement (Third) of Trusts. Accordingly, summary judgment was properly granted in favor of BNYM, albeit on a different basis than that articulated by the trial court.

We begin our discussion by noting the distinction between a party in its individual capacity and that same party in its representative capacity. In *Hooke v. Equitable Credit Corp.*, 33 Md. App. 437 (1976), this Court underscored the significance of that distinction. There, the Hookes entered into two loans with Equitable Credit Corporation ("Equitable"). *Id*. at 438. Whereas the first loan (the "corporate note") was evidenced by a confessed judgment executed by two corporations that the Hookes owned, the second loan (the "trustee note") was evidenced by a confessed judgment executed by the Hookes *as trustees* pursuant to a trust instrument for the benefit of their minor children.[4] *Id*.

Upon default of both notes, Equitable sued "A. Michael Hooke, Sr. and Marguerite E. Hooke . . ., Trustees under that Certain Deed of Trust dated May 1, 1972[.]" *Id*. at 438-39. In other words, Equitable sued the Hookes only in their capacities as trustees for nonpayment of both the corporate and trustee notes. *Id*. Equitable then sought a "Judgment

---

[4] The Hookes personally guaranteed payment of both the corporate note and the trustee note. *Hooke*, 33 Md. App. at 438.

by Confession for the Plaintiff" for the outstanding sums provided for in the notes. *Id*. at

439.

Ultimately, this Court reversed the judgment as it pertained to the corporate note

because the Hookes did not execute the corporate note in their capacities as trustees. *Id*. at

440, 443-44. We explained:

> Since Equitable elected to sue the Hookes only in their capacities as trustees, the actual defendants in the suit were never served . . . . *See* [*Bank of Am. Nat'l Tr. & Sav. Ass'n v. Carr*, 138 Cal. App. 2d 727, 292 P.2d 587 (1956)], where the California Court of Appeals made it clear that *a party must be served in that legal capacity in which he is sought to be bound. We adhere to that principle*.

*Id*. at 443 (emphasis added).[5] From this case we extract the principle that a party in its

individual capacity is not the same as that party in its trustee capacity.

Having established the legal significance of distinguishing between a party in its

trustee capacity and a party in its individual capacity, we turn to whether a trustee may be

personally liable. We begin with the Maryland Trust Act, codified at ET § 14.5-101 et seq.

Section 14.5-908 discusses a trustee's liability, and provides:

> (a) Except as otherwise provided in the contract, a trustee is not personally liable on a contract properly entered into by the trustee in the fiduciary capacity of the trustee in the course of administering the trust if the trustee in the contract disclosed the fiduciary capacity.
>
> (b) A claim based on a contract entered into by a trustee in the fiduciary capacity of the trustee, on an obligation arising from ownership or control of trust property, or *on a tort committed in the course of administering a trust, may be asserted in a judicial proceeding against the trustee in the fiduciary*

---

[5] Because the Hookes, as trustees, had executed the trustee note and had alleged no facts supporting a defense to the trustee note, we affirmed the trial court's decision sustaining the confessed judgment as to that note. *Hooke*, 33 Md. App. at 444.

7

*capacity of the trustee, regardless of whether the trustee is personally liable for the claim.*

(Emphasis added).

Unfortunately, although ET § 14.5-908(b) provides that a trustee may be sued "on a tort committed in the course of administering a trust," it does not address the parameters of the trustee's tort liability and, more importantly, the circumstances that may give rise to a trustee's personal liability.

We initially note that we are not aware of any appellate decisions interpreting ET § 14.5-908. The legislative history of the Maryland Trust Act indicates that it is "a modified version of the Uniform Trust Code drafted by the Uniform Law Commissioners." Senate Judicial Proceedings Committee, Floor Report, House Bill 83 (2014). Our research into the history of ET § 14.5-908 reveals no intentional deviations from the Uniform Trust Code. Additionally, our review of the Maryland Trust Act's legislative history uncovered nothing pertinent to the issues presented in this appeal.

We therefore look to the Restatement (Third) of Trusts (2012) for guidance, and note its express statement that, for a trustee to be held personally liable, it must be "personally at fault." Section 106 of the Restatement (Third) of Trusts provides:

> A trustee is *personally liable*:
> (1)   on a contract entered into in the course of trust administration only if:
>        (a) in doing so, the trustee committed a breach of trust; or
>        (b) the trustee's representative capacity was undisclosed and unknown to the third party; or
>        (c) the contract so provides;
> (2)   for a tort committed in the course of trust administration, or for an obligation arising from the trustee's ownership or control of trust property, *only if the trustee is personally at fault*.

8

(Emphasis added).

The Comments to § 106 provide further context and guidance concerning a trustee's personal liability for actions related to the administration of the trust. They provide that:

> *(b)(2). Tort.* A trustee is personally liable for a tort committed in the course of trust administration only if the trustee is personally at fault. Thus, a trustee is not personally liable for a tort committed by the trustee's agent or employee where there is no personal fault on the part of the trustee. . . .

> *(b)(3). Obligation arising from ownership or control of trust property.* A trustee is not personally liable for an obligation arising from the trustee's ownership or control of trust property provided the trustee is not personally at fault. For example, in the absence of the trustee's personal fault, the trustee is not liable individually for personal injuries occurring, or taxes imposed, on trust property, or for the expense of remedying the toxic or hazardous condition of trust property . . . .

The Restatement and its official comments unequivocally provide that a trustee may be held personally liable for claims sounding in tort "only if the trustee is personally at fault." In other words, the Restatement does not preclude the possibility that BNYM could be held individually liable for actions it took in its representative capacity as trustee. But BNYM could be individually liable only if BNYM, in its capacity as trustee, were personally at fault for appellants' injuries. Unfortunately, the Restatement does not define the term "personally at fault."

In their brief, appellants cite to *Allen v. Dackman*, 413 Md. 132 (2010) for the proposition that BNYM was an "owner" of the property pursuant to the Baltimore City Housing Code and therefore could be held personally at fault for their injuries. As we will explain, *Dackman* is no panacea for the difficulties with appellants' cause of action against BNYM individually.

9

In *Dackman*, the plaintiffs alleged that they had suffered injuries caused by lead paint exposure while living at a property owned by Hard Assets, LLC. *Id*. at 135. Relevant there, the "Baltimore City Housing Code imposed liability on, among other entities, any individual who 'owns, holds, or controls' the title to a dwelling."[6] *Id*. at 136-37 (footnote omitted). The plaintiffs filed a complaint in the Circuit Court for Baltimore City, wherein they alleged that Jay Dackman and Hard Assets owned the property at some point while they had lived there, "and had negligently failed to maintain the property." *Id*. at 137. Dackman responded by filing a motion for summary judgment, "arguing that he could not be held personally liable as a matter of law." *Id*. at 138. The trial court granted Dackman's motion, and this Court affirmed, reasoning that Dackman could not be held liable for negligence because he was not an "owner" of the property as defined in the Baltimore City Housing Code, and because he could not be held liable for negligence allegedly committed by Hard Assets. *Id*.

The Court of Appeals reversed and remanded. The Court began its analysis by noting the unusual facts of the case, as set out by this Court. The plaintiffs were young children—approximately three years old and one year old—when they and their family members moved into the property in 1999. *Id*. at 138-39. When the prior owner of the property failed to pay taxes, Hard Assets purchased the property in lieu of a foreclosure. *Id*. at 139. Dackman was one of two members of Hard Assets, and it was his business

---

[6] In a footnote, the *Dackman* Court noted that the relevant section of the Baltimore City Housing Code was later repealed and replaced. 413 Md. at 136 n.3. We note that appellants refer to the same prior version of the Housing Code as interpreted by *Dackman*.

10

practice to purchase and sell properties rather than keep them for rental income. *Id.*

However, for the year that Hard Assets owned the subject property, Dackman "was

responsible for running the day-to-day business affairs of Hard Assets." *Id.* at 140.

The Court of Appeals framed the issue for review as follows: "To decide this case,

we must interpret the Housing Code and determine whether [Dackman] could be held

individually liable for [plaintiffs'] alleged injuries." *Id.* at 141. The Court noted that the

Baltimore City Housing Code

> established the class of individuals who were required to follow the Code's
> provisions. According to the Code, any "owner or operator of a property
> subject to this Code shall be responsible for compliance with all of the
> provisions of the Code." Balt. City Code, Art. 13, § 310(a). The Code
> defined an "owner" as "any person, firm, corporation . . . who . . . owns,
> holds, or controls the whole or any part of the freehold or leasehold title to
> any dwelling or dwelling unit, with or without accompanying actual
> possession thereof . . . ." Balt. City Code, Art. 13, § 105(jj).

*Id.* at 144-45 (alterations in original) (footnote omitted).

The Court applied the Housing Code's definition of "owner" to the evidence

regarding Dackman's role in managing the property. *Id.* at 145. Ultimately, the Court

construed the term "owner" to include "not only . . . those who own the title to the dwelling,

but also to a wider group of individuals who hold or control the title." *Id.* at 149. Noting

that it had never defined the term "control" as used in the Housing Code, the Court held

that it "'carries with it a requirement that the entity in question have an ability to change or

affect the' interest being controlled." *Id.* at 149 (quoting *Dyer v. Criegler*, 142 Md. App.

109, 117 (2002)).

11

In determining whether Dackman qualified as an "owner" under the Housing Code, the Court of Appeals noted that Dackman

> stated in his deposition that he was responsible for running the day-to-day affairs of Hard Assets during the time period when Hard Assets both acquired and sold [the property at issue]. [Dackman] also executed the deed certification when Hard Assets acquired the property, signed the complaint seeking to remove [plaintiffs] from the property, and signed the deed when Hard Assets sold the property.

*Id.* Based on these facts, the Court held that there was "sufficient evidence for a jury to find that [Dackman] may have changed or affected the title[]" such that he could constitute an owner for purposes of the Housing Code. *Id.* The Court further noted that,

> even if [Dackman] did not actually direct these actions, the trier of fact could find that he had the "ability" to do so. This would have also been sufficient to establish that he controlled the title to the property. Finally, there is no evidence that anyone other than [Dackman] was responsible for the day-to-day management of Hard Assets or for decisions affecting the title to the property, which supports the conclusion that [Dackman] was the person who made decisions affecting the title to the property.

*Id.* at 150 (footnote omitted).

After establishing that Dackman could be found to be an "owner" for purposes of the Housing Code, the Court next considered whether Dackman could be held personally liable where his only connection to the case stemmed from his membership in Hard Assets. *Id.* at 152. The Court noted that, "[a] member of an LLC generally is not liable for torts committed by, or contractual obligations acquired by, the LLC." *Id.* at 152. Nevertheless, the Court stated that "[a]n LLC member is liable for torts he or she personally commits, inspires, or participates in because he or she personally committed a wrong, not 'solely' because he or she is a member of the LLC." *Id.* at 154 (citing *Weber v. U.S. Sterling Sec.,*

12

*Inc.*, 924 A.2d 816, 824-25 (Conn. 2007)). The Court of Appeals concluded,

> the trier of fact could find that [Dackman] is personally liable for [plaintiffs']
> alleged injuries. . . . [Dackman] managed Hard Assets' day-to-day affairs
> during the period that Hard Assets owned the property, and there is no
> evidence that anyone else managed those affairs during that period. These
> facts are sufficient evidence for the trier of fact to find that [Dackman]
> personally committed, inspired, or participated in Hard Assets' decisions
> regarding maintenance of the property.

*Id*. at 155.

Appellants urge us to hold that BNYM as Trustee was an "owner" of the property

under *Dackman*, and therefore liable under the Baltimore City Housing Code. *Dackman*

makes clear, however, that even if BNYM as Trustee qualified as an "owner" under the

Housing Code, that determination does not mean that the trustee is personally liable in tort.

In our view, the more significant aspect of *Dackman* as it relates to this case is the

Court's discussion of *Shipley v. Perlberg*, 140 Md. App. 257 (2001). There, this Court was

tasked with determining "whether a corporate officer and director [was] individually liable

for lead paint injuries to the resident of a corporately owned property." *Id*. at 261. As in

*Dackman*, we were tasked with construing the term "owner" for purposes of the Baltimore

City Housing Code. We concluded that Perlberg was not an "owner" for purposes of the

Housing Code because a corporation "owned the subject property during the relevant time

period[,]" and because "[t]here [was] no evidence that Perlberg had title to the subject

property or exercised ownership in the manner contemplated by the Code." *Id*. at 277.

On this point, the *Dackman* Court disagreed:

> The [*Shipley*] court concluded that Perlberg was not an "owner" because the
> evidence was "undisputed that [the corporation] owned the subject property
> during the relevant time period" and that there was "no evidence that Perlberg

13

had title to the subject property."  Based on these facts, the court concluded that there was "no evidence that Perlberg . . . exercised ownership in the manner contemplated by the Code."

> We disagree with the Court of Special Appeals' reasoning in *Shipley*. The court concluded that Perlberg was not an "owner" under the Housing Code because he did not have title to the property at issue in that case.  The court reached this conclusion even though there was evidence that Perlberg was involved with the buying and selling of that property. As we have explained in this opinion, the Housing Code expanded the meaning of the term "owner" to include not only entities that hold the title to dwellings, but also entities that control the title to those dwellings.  The ability to buy and sell the property where an alleged injury occurred is an example of controlling the title to a dwelling.

413 Md. at 150 n.13 (internal citations omitted).

Although the Court of Appeals disagreed with the *Shipley* Court's reasoning that Perlberg was not an "owner" under the Housing Code, it agreed with our ultimate conclusion that Perlberg could not be held personally liable for the alleged lead paint violations where the uncontradicted evidence indicated that Perlberg "had no direct involvement" with the property.  *Id*. (quoting *Shipley*, 140 Md. App. at 262).

The *Dackman* Court stated:

> There was no evidence in that case that Perlberg was involved with the part of the corporation that dealt with the management of any properties.  To the contrary, uncontradicted evidence indicated that another corporate officer was responsible for managing properties and that Perlberg "had no direct involvement in the subject premises, of any type." *Accordingly, Perlberg may have been an "owner" under the Housing Code, but he could not have been held personally liable for the alleged violations of the Code. As we discuss in this opinion, infra, a corporate officer is not liable for torts committed by the corporation unless he personally committed, inspired, or participated in those torts.*

14

*Id.* (emphasis added) (internal citations omitted). Thus, despite the fact that Perlberg would have qualified as an "owner" under *Dackman*, the Court of Appeals acknowledged that, under the facts of that case, Perlberg could not have been held personally liable in tort.

We conclude that *Dackman*—and its insightful commentary of *Shipley*—provides the guideposts for resolution of the instant case. We begin by noting that BNYM, in its trustee capacity, was the record title owner of the Property during the relevant time period alleged by appellants. As the record title owner of the Property, BNYM as Trustee was an "owner" under the Housing Code. *Dackman* teaches, however, that one's status as an "owner" under the Housing Code does not equate to personal liability for violations of the Code. ("Perlberg may have been an "owner" under the Housing Code, but he could not have been personally liable for the alleged violations of the Code." *Id.*). Under § 106 of the Restatement (Third) of Trusts, a trustee is personally liable for torts arising from the trustee's ownership or control of trust property "only if the trustee is personally at fault." In our view, the description of trustee tort liability as set forth in the Restatement (Third) of Trusts is wholly consistent with the principles enunciated by the Court of Appeals in *Dackman*.

Thus, our ultimate inquiry is whether the appellants in this case submitted sufficient facts to show that BNYM as Trustee was personally at fault for their alleged injuries. We conclude that they did not.

In its Motion for Summary Judgment, BNYM argued, among other things, that BNYM as Trustee had no authority or responsibility to manage the properties purchased by the trust. Attached to the motion was the affidavit of Phillip R. Burnaman, II, who

15

expounded upon the "role and responsibilities of a securitization trustee in a Residential Mortgage Backed Securities (RMBS) issue." In his affidavit, Burnaman stated that the PSA "defines the responsibilities of the servicer and the securitization trustee (and other parties, if any). The PSA defines their non-discretionary roles and is equally important for limiting the discretionary activities of the RMBS trust by necessarily limiting and defining the actions of the contracted participants." (Footnotes omitted). The affidavit explains that, whereas the "servicer's primary function is to serve as the point of contact with the borrower[,]" the trustee is typically only responsible for: "safekeeping of cash and collateral, distribution of cash flows from the collateral, and relaying trust asset and performance information received from the servicer to the certificateholders."

Burnaman further recited that, pursuant to the PSA in this case, "the servicer, not the securitization trustee, used its discretion and made all decisions regarding that REO[7] property and its protection and conservation." (Emphasis removed). Regarding ownership and control of the property, Burnaman stated that,

> It is clear here, and consistent with RMBS transactions in my experience, that the securitization trustee was not the owner of the mortgage loans or the REO property, did not act like an owner of the REO property and was not consulted by the servicer when and as the servicer made a series of decisions regarding the loan foreclosure, the REO property and appropriate loss mitigation alternatives.

Burnaman's affidavit consistently asserted that BNYM as Trustee's only

---

[7] "REO" stands for "Real Estate Owned." According to Burnaman's affidavit, "'Real Estate Owned' is the common term used to describe a property owned by a lender – a bank, insurance company, RMBS trust, or government agency such as Fannie Mae."

16

involvement with trust property was passive, and that it was "not engaged in the active real estate business."  Rather, the PSA directed the servicer to handle such activities.  According to Burnaman,

> The servicer was directed to mitigate losses, ultimately by initiating a foreclosure action against the mortgagor and selling the collateral property, then, returning that cash to the certificateholders.  Indeed, the PSA provided specific instruction for the exceptional (*but not unforeseen*) cases where a *foreclosure action was initiated and the property could not be sold at the foreclosure auction.*  Consequently, the collateral property became REO . . . and the servicer was directed under the PSA to sell it, as practicable, in order to mitigate certificateholders' losses.  *In the subject case, while a bid (at the foreclosure sale) higher than the mortgage loan amount would have paid off the loan, it appears that no such bid was made, and the servicer effected the transfer of title to the property on behalf of the RMBS trust to mitigate losses on that mortgage loan, as required.*

(Second emphasis added).  Burnaman further explained that, in his opinion, the federal tax code requires securitization trustees to be passive, and that trustees are "not empowered to manage or improve any REO properties[.]"

Finally, regarding environmental responsibilities, Burnaman stated that, in his experience, "securitization trustees did not participate in any aspect of environmental evaluation, management or remediation of RMBS trust assets and were not expected to incur any environmental liability from those trust assets."  Burnaman's own review of the PSA did not reveal "that the securitization trustee had any role in the environmental review of the properties that might become assets of the RMBS trust."  Instead, the PSA "provided that, in environmental matters, the Master Servicer would have sole authority[.]"

Although not explicitly asserted in his affidavit, Burnaman essentially opined that BNYM as Trustee's passive role regarding the property precluded any finding that it was

17

personally at fault for appellant's injuries. BNYM as Trustee had no responsibility to manage or maintain any properties owned by the trust, and because it did not engage "in the active real estate business," it could not have been personally at fault for any negligence regarding the Property itself.

Whereas Burnaman's affidavit provided specific sworn facts to support the contention that BNYM as Trustee was not personally at fault, appellants' opposition to BNYM's Motion for Summary Judgment provided no facts rebutting Burnaman's affidavit. Instead, appellants simply argued that BNYM as Trustee purchased the property at foreclosure during their tenancy and that the Baltimore City Housing Code includes "trustee" in its definition of "owner" for purposes of liability.

These arguments are unavailing. As *Dackman* and *Shipley* demonstrate, that BNYM as Trustee was an "owner" under the Housing Code does not mean that the trustee is personally liable for torts committed on the Property. Appellants were required to plead facts sufficient to show that BNYM as Trustee was "personally at fault," meaning that BNYM as Trustee "personally committed, inspired, or participated" in the alleged torts. *Dackman*, 413 Md. at 141.

Here, appellants' bald assertions failed to contradict BNYM's sworn facts. As stated above, in the context of a motion for summary judgment,

> [O]nce the moving party ha[s] provided the court with sufficient grounds for summary judgment, "[i]t is . . . incumbent upon the other party to demonstrate that there is indeed a genuine dispute as to a material fact. He does this by *producing factual assertions, under oath*, based on the *personal knowledge* of the one swearing out an affidavit, giving a deposition, or answering interrogatories. Bald, unsupported statements or conclusions of law are insufficient."

18

*Reiter*, 179 Md. App. at 660 (alterations in original) (quoting *Miller*, 114 Md. App. at 27). BNYM submitted uncontroverted facts to show that BNYM as Trustee's role regarding the property was passive. Appellants failed to submit facts that indicated otherwise. Accordingly, appellants failed to produce facts sufficient to show that BNYM as Trustee was personally at fault, i.e., that BNYM as Trustee personally committed, inspired, or participated in the alleged torts. *Dackman*, 413 Md. at 154. Absent such facts, BNYM cannot be liable in its individual capacity. Summary judgment was therefore properly granted in favor of BNYM.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**